PEOPLE v SZCZYTKO

1. RAPE—ASSAULT WITH INTENT TO RAPE—PRELIMINARY EXAMINATION.

Evidence produced by the people at the preliminary examination was sufficient to bind defendant over on a charge of assault with intent to rape where the evidence showed that defendant had gained entrance to an apartment by misrepresentations made to the babysitter, the complainant, that he was in the apartment for several minutes attempting to make telephone calls and using the bathroom before he turned off the lights, and that he proceeded to assault the complainant, during which he tore off most of her clothes.

2. RAPE—INTENT—INFERENCES.

Intent to rape can be inferred from the defendant's tearing off the complainant's clothes, even though defendant suggests on appeal that the tearing off of the clothes could have been for a reason other than rape.

3. CRIMINAL LAW—CONFESSIONS—WARNING OF RIGHTS.

Defendant's waiver of his rights to counsel and to remain silent after his arrest for registering in a hotel under a fictitious name makes admissible statements made during his subsequent interrogation concerning his commission of an assault with intent to rape.

4. CRIMINAL LAW—EVIDENCE—CLOTHING OF VICTIM—DISPLAYING CLOTHES.

Prosecutor's throwing the bloody garments of the victim of an assault on the defense table was not reversible error where the trial judge properly cared for the situation by asking the prosecutor to put the garments into a bag.

REFERENCES FOR POINTS IN HEADNOTES

[1] 44 Am Jur, Rape § 100 *et seq.*
[2] 44 Am Jur, Rape § 108.
[3] 21 Am Jur 2d, Criminal Law §§ 316, 317.
[4] 29 Am Jur 2d, Evidence § 771.
[5] 21 Am Jur 2d, Criminal Law § 58 *et seq.*

5. CRIMINAL LAW—INSANITY—DISPOSITION OF DEFENDANT—PROSECU-
TOR'S REMARKS.

  Remarks by the prosecutor that if the defendant was found not
  guilty by reason of insanity defendant could be released from
  the mental institution merely by going through some legal
  paperwork did not result in reversible error where the defend-
  ant's counsel had raised the issue in his argument and the trial
  judge had made it clear to the jury that the disposition proce-
  dures of the hospital were far beyond the province of the jury.

Appeal from Kent, Stuart Hoffius, J. Submitted Division 3 February 2, 1972, at Grand Rapids. (Docket No. 10895.) Decided April 26, 1972. Leave to appeal granted, 388 Mich 755.

Dennis R. Szczytko was convicted of assault with intent to rape and assault with a dangerous weapon with intent to commit great bodily harm less than murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James K. Miller,* Prosecuting Attorney, and *Donald A. Johnston, III,* Chief Appellate Attorney, for the people.

*George E. Pawlowski,* for defendant on appeal.

Before: FITZGERALD, P. J., and R. B. BURNS and HOLBROOK, JJ.

HOLBROOK, J. Defendant was convicted before a jury of the crimes of assault with intent to rape, MCLA 750.85; MSA 28.280, and assault with a dangerous weapon with intent to commit great bodily harm less than murder, MCLA 750.84; MSA 28.279.

On appeal defendant raises four issues which we restate and consider in proper order.

I.

Whether there was sufficient evidence presented

at the preliminary examination to bind defendant over to the circuit court on the charge of assault with intent to rape; and whether there was sufficient evidence presented to the jury to support a verdict of guilty beyond a reasonable doubt on the same charge?

The complaining witness, Miss Fortuna, a 15-year-old babysitter, testified on direct examination at the preliminary examination in part as follows:

"*Q.* Approximately what time did you arrive at her home that day?

"*A.* About 6:30.

"*Q.* How long were you to baby sit for her?

"*A.* I usually baby sit for her 'til about 3 o'clock.

"*Q.* I see. And, do you ordinarily leave after completing your job for an evening, or do you stay the rest of the night?

"*A.* I leave.

"*Q.* How far do you live from this address?

"*A.* Four blocks.

"*Q.* Now then, while you were there January—on January 11th, what, if anything, occurred?

"*A.* Well, first, I just watched TV, and then the little boy from downstairs came upstairs to watch TV too. So, he left about 9 o'clock. Then I sat down and watched TV until the television set went off. And, then I read for a little while. Then there was a knock on the door. And then I asked who it was and he said he was a friend of Peggy's, that Peggy was downstairs in the car and she had car trouble. Then he—and he asked—

"*Q.* What did you do then? He asked something?

"*A.* He asked to use the phone.

"*Q.* I see.

"*A.* So I let him in and he sat down for a little while and asked where the bathroom was and he went in to use the bathroom. Then he came back in and he used the phone. Then after—he dialed the number, but nobody answered. Then he sat down for a little while again and he turned off the lights and he started beating me up.

*"Q.* Is that person in court here this morning?

*"A.* Yes.

*"Q.* Would you point him out if you can?

*"A.* Right there.

*"Q.* Which one? Describe him for the record so we'll know who you're talking about, or who you're referring to.

*"A.* The one with the black and red on.

*"Mr. Kamm [assistant prosecuting attorney]:* May the record show the witness has indicated the defendant in this case?

*"The Court:* It may be so indicated.

*"Q.* Could you describe now what happened?

*"A.* He started to choke me and started to beat me up, and then I don't think he used his hands for a little while, but I don't think he used his hands all the time because it started to hurt more. Then I blacked out.

*"Q.* I see. Were you dressed at this time?

*"A.* Yes.

*"Q.* What were you wearing?

*"A.* I was wearing a pair of lavender slacks and I had a white ruffled blouse on and I had my coat on and my scarf and a pair of boots.

*"Q.* You had your coat on?

*"A.* Mmm hmm.

*"Q.* How did it happen that you were so dressed at this hour of the morning?

*"A.* I was waitin' to go outside to see Peggy.

*"Q.* Oh, I see. Then you say you blacked out?

*"A.* Uh huh.

*"Q.* Did you regain conciousness *[sic]* at any time while you were still at the apartment?

*"A.* When the police came.

*"Q.* What was your condition of dress at that time? Do you remember?

*"A.* I didn't have my pants on or my underpants and my blouse was pushed up and my bra was pushed up.

*"Q.* What about the coat?

*"A.* The coat was off.

*"Q.* And the boots?

*"A.* One of them was off and one was on."

On cross-examination she testified in part as follows:

"*Q. [By Mr. Pawlowski, defense attorney]:* Now, you've testified that when you awoke, your clothes were in disarray, is that correct?

"*A.* Most of them were off.

"*Q.* Is there any indication to you that you'd been molested in any way?

"*A.* I don't know.

"*Q.* You were unconcious *[sic]* at that time, is that right?

"*A.* Yes.

"*Q.* Can you recall to the best of your recollection at what point you did become unconcious *[sic]?* At what point during the activity?

"*A.* I don't really know.

"*Q.* Well, you said on direct that you—the man was striking you with the telephone and started choking you, is that right?

"*A.* I didn't say it was a telephone. I said that it was something other than his hand or his fist.

"*Q.* And there was choking going on?

"*A.* Yes.

"*Q.* Was he still in this act when you passed out? Were you still being assaulted?

"*A.* Yes."

The partial contents of a statement made by the defendant to officers of the Grand Rapids Police Department after proper Miranda[1] warnings had been given to him were related in the testimony by Captain Edward T. Glynn at the preliminary examination as follows:

"*Q. [By Mr. Kamm, assistant prosecuting attorney]:* I show you what has been marked for identification as Exhibit 1. Do you recognize it or can you identify it?

"*A.* Yes sir, this is the statement of Dennis Szczytko given on the 13th day of January, 1970.

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

"*Q.* Now sir, how did you—what—what is the content of this without going into it word for word. Just what is it concerned with?

"*A.* That Dennis Szczytko went to a residence on Sixth Street. The residence is rented by Mrs. Peggy Siedlicki. He went up to this apartment which is located on the second floor and there was a young white female there. He rapped on the door and he talked to her, and after a period of time, he assaulted this girl. He began beating on this girl and then after a period of time, he heard, or saw some lights and he ran to the kitchen and he jumped out a second-story window.

"*Q.* Sir, how did it happen that this was the content of this particular statement of this alleged offense, when in fact you had first gone to the New Mertens and arrested him for a hotel violation? In other words, what led you to Mr. Szczytko?

"*A.* Well, under normal police investigation, we eliminated the possible suspects down to Dennis Szczytko.

"*Q.* I see.

"*A.* We began to check the bus depot, the railway depot, and at the airport, we received information that a young man matching the description of Dennis Szczytko was there and left in a taxi cab. After—

"*Q.* What time was he there?

"*A.* Approximately, I would say about 2 o'clock, sir; I'm not sure."

Defendant's statement also contained information to the effect that he saw a flashlight at the door or window at which time he left the apartment. He then went home where his mother was waiting up for him, and that he washed some of his clothes and threw his shirt in the trash barrel.

Defendant asserts that the evidence presented was insufficient to justify the order of the examining magistrate binding him over to the circuit court for trial on the charge of assault with intent to commit the crime of rape.

The applicable rule of law on this issue is stated in the case of *People v Ogg,* 26 Mich App 372, 377–380 (1970), as follows:

"Defendant contends that, upon the basis of the transcript of proceedings had before the examining magistrate, the prosecution failed to establish that a crime had been committed or that defendant committed it.

"The people counter by asserting that in order to establish error by the examining magistrate in binding a defendant over for trial, defendant has the burden of establishing a clear abuse of discretion; that absent a clear abuse of discretion an appellate court will not disturb the findings of the magistrate, *People v Dellabonda* (1933), 265 Mich 486; and that no such abuse of discretion has been alleged or shown by defendant.

\* \* \*

"A finding of probable cause at a preliminary examination does not require that the guilt of a defendant be established beyond a reasonable doubt. *People v Ray* (1966), 2 Mich App 623. This Court may not substitute its judgment for that of the magistrate unless there has been a clear abuse of discretion in his determination of probable cause. *People v Dellabonda, supra; People v Davis* (1955), 343 Mich 348; *People v Marklein* (1960), 358 Mich 471; *People v O'Leary* (1967), 6 Mich App 115, 120. No such abuse has been alleged or shown. This Court is of the opinion that, upon a thorough review of the record of the proceedings had before the examining magistrate, the evidence was sufficient to uphold the magistrate's action in binding the defendant over for trial in circuit court."

Under the foregoing rule, this Court may not substitute its judgment for that of the magistrate unless there has been a clear abuse of discretion in his determination of probable cause. No such abuse has been alleged or shown in the instant case.

The evidence produced by the people at the

preliminary examination showed that defendant gained entrance to the apartment by misrepresentations made to the babysitter; that he was in the apartment for several minutes attempting to make telephone calls and using the bathroom before he turned off the lights and proceeded to assault the complaining witness at which time he tore off most of her clothes from her body. His assault was interrupted by someone with a flashlight at the door or window which caused him to leave the apartment. The turning off of the lights by the defendant and proceeding to assault the young girl, ripping off her clothes from her body, clearly infers an intent to rape.

This Court is of the opinion that upon a thorough review of the record of the proceedings had before the examining magistrate the evidence is sufficient to uphold the magistrate's action in binding the defendant over on this charge.

The defendant also claims there was insufficient evidence presented to the jury to support a verdict of guilty beyond a reasonable doubt on the same charge.

In addition to the testimony presented at the preliminary examination there was other pertinent evidence produced at the trial as follows:

Miss Fortuna arrived at the Siedlecki apartment in time to help Mrs. Siedlecki put Christine to bed and Mrs. Siedlecki thereafter left for the evening at approximately 7:30 p.m. Once Christine was asleep, Miss Fortuna and Carrie Lynn began watching television in the living room and were soon joined by young Eddie Rodriquez, the preschool-age son of Mrs. Esther Rodriquez who lived in the apartment downstairs. Before long, Carrie Lynn fell asleep in front of the television set and was taken to bed and Eddie, whose bedtime had

also arrived, was called home by his mother. After the children had gone to bed, Miss Fortuna continued watching television until all of the networks discontinued broadcasting at 2 a.m. Sunday morning, January 11, 1970, at which time she began reading for entertainment.

After reading for perhaps half an hour, Miss Fortuna heard someone climb the stairs and knock on the apartment door. She inquired who was there without unlocking or opening the door. A male voice on the other side responded that he was a friend of Peggy Siedlecki's "and he said that she [Peggy] was downstairs in the car and the battery in the car was dead and he wanted to use the phone". Satisfied by this explanation, she unlocked and opened the door and saw defendant Dennis R. Szczytko standing on the other side.

Defendant entered the apartment, went through the motions of using the telephone but without talking to anyone, sat down for a few moments, and then "asked where the bathroom was". Miss Fortuna told him it was next to the kitchen and he left the room. While defendant was in the bathroom, Miss Fortuna put on her coat and scarf because defendant had told her that Mrs. Siedlecki was waiting downstairs and she assumed she would now be going home. Next, Miss Fortuna "heard the toilet flush and he came back and he used the phone but I guess he didn't reach his party because he put it down right away".

Then suddenly, defendant reached for the wall switch and turned out all the lights in the apartment. He forcibly seized the complaining witness, as she testified at trial, "he started to beat me up. * * * He kept hitting me, he started to choke me". She was struck repeatedly but did not know with what. Nor did she know the reason for the sudden

attack; "there wasn't any conversation". Miss Fortuna did, however, remember defendant ripping her clothing from her body while he was striking her. That was her last recollection of the assault; within seconds she either fainted or was beaten insensible.

Meanwhile, Mrs. Rodriquez in the apartment downstairs had been awakened at about 2:30 a.m. when her husband arrived home in an intoxicated condition. While she was attempting to get her husband into bed, Mrs. Rodriquez heard "footsteps going upstairs" and "I heard the knock on the door and then I heard somebody talking". Minutes later she "heard kind of a scream" from upstairs. At first she thought it was Mrs. Siedlecki, but then she recalled that a babysitter was taking care of the children that night. Mrs. Rodriquez wanted to call the police immediately but her husband disapproved so she tried calling the Siedlecki apartment instead. When no one answered the telephone, however, she proceeded with her original thought and called in a disturbance complaint to the Grand Rapids Police Department. She then tried to call the upstairs apartment again, but the telephone there would not ring.

At 2:59 a.m., Officer Lawrence J. Peterson, who was patrolling the west side in a one-man police cruiser, received a radio dispatch to proceed immediately to the upstairs apartment of 750 Sixth Street, N.W., on a "disturbance call". He arrived within minutes but to his surprise heard nothing from outside the building. Officer Peterson entered the building and climbed quietly to the top of the stairs. Just outside the upstairs apartment door, he "could hear this heavy breathing and a thumping sound and the breathing, to me, sounded like somebody that has just been in a fight or struggle".

At this point, Officer Peterson was joined by Officer Daniel J. McCarthy, who had been dispatched to the scene as "back-up" on the disturbance call. Officer Peterson explained what he had heard from inside the apartment and then knocked on the apartment door with his flashlight and announced "Police". There was no answer from inside, but the door, which was not securely closed, creaked partially open. The officers, who could see that it was completely dark in the apartment, shined their flashlights inside and slowly pushed the door open the rest of the way.

Immediately upon entering the darkened apartment, the officers saw in their flashlight beams a pair of legs "protruding past the chair into the living room". Running to that part of the room, they found "a body on the floor, spread out and there was blood splattered on the legs and the body and the head was all blood-covered and big gashes in it. The hair was full of blood". The victim "was completely naked except for the piece of clothing around the neck", namely a blood-soaked blouse. She "wasn't recognizable" and, as Officer Peterson recalled, "at that time, she didn't look alive". The telephone receiver was off the hook, cracked, bloodstained, and laying next to the prostrate girl. Officer Peterson turned to his associate and said, "Mac, go call an ambulance".

While Officer McCarthy ran downstairs to summon an ambulance, Officer Peterson noted that the breathing of the victim, who was unconscious, was only barely audible, if at all, and that therefore, she could not possibly be the individual whose "heavy breathing" he had heard moments before from outside the door. At about the same time, something drew Officer Peterson's attention to the kitchen of the apartment. He drew his

revolver and ran into the kitchen where he "noticed a kitchen window open * * * on the west side of the house. * * * The curtains were blowing and this screen was tore *[sic]* away like something had gone through the screen. The screen was not open".

Simultaneously, Officer McCarthy, while running down the stairs, "heard a crash and a rattle, a scraping noise" which came "from outside". As he hastened to the point from which this noise emanated, Officer Peterson yelled at him from the kitchen window that he thought the assailant had just jumped out that window. Officer McCarthy looked around under the window and noticed "a small bush covered with ice that was broken down and you could see where somebody had been in the snow * * * and tracks going to the alley". He also observed "blood beneath the window and in the tracks leading to the alley". After calling an ambulance for the victim, Officer McCarthy followed these tracks but lost the trail at the corner of Alpine Avenue and Sixth Street which, as it subsequently developed, is only a short distance from, and on the way to, defendant Szczytko's house at 913 Fourth Street, N.W.

Back inside the apartment, Officer Peterson removed a blanket from the bedroom where the children were sleeping and used it to cover Miss Fortuna, who then "started moaning a little weak sound". She slowly regained consciousness, moved to the couch, and gave Officer Peterson a description of defendant Szczytko. The ambulance then arrived and transferred her to St. Mary's Hospital where, after she had received emergency treatment, she elaborated further upon her description for Officers Peterson and McCarthy at 4:45 a.m. Miss Fortuna was hospitalized for a total of 6 days

and received more than 30 stitches about her eyes, mouth, and chin. When she looked at herself in a mirror, she discovered that "my face was all puffed up. * * * About twice the size it was normally and my lips were all—puffed up and besides my face was all bruised". She required extensive treatment by a plastic surgeon and was still being treated at the time the case went to trial.

Richard Dryer, police officer of the City of Grand Rapids, testified at trial as to the partial contents of the statement made by the defendant as follows:

"*Q. [By Mr. Zerial, assistant prosecuting attorney]:* After the rights were given by Captain Glynn would you tell us what he—what he said and in narrative form, please?

"*A.* Yes, he said that these stories he was telling us before was the truth, that he left the—his home around seven p.m. went to Skippers Tavern on Stocking where he played pool and drank some beer; that then he continued on and went to the Anchor Bar till closing time, approximately 2:30; that he went across the street to the Red Line on Bridge Street, he used the bathroom, he left there, he went west on Bridge Street to Seward, then north on Seward to Second Street; from Second Street west to Stocking; from Stocking Street to Alpine; from Alpine north to Sixth Street. Then from Sixth Street over a little bit east to the Siedlecki home.

"*Q.* Then what happened next, sir?

"*A.* He went up the stairs and he knocked on the door and he was going to visit Peggy.

"*Q.* Pardon me?

"*A.* He knocked on the door to see if Peggy was home.

"*Q.* What did he say next, sir?

"*A.* The babysitter came to the door and at this time he was aware that Peggy was not home. He asked if he could come in and use the phone and he was admitted into the living room where he pretended to use the phone. He stated he dialed a couple numbers and then quit. Asked the babysitter some—something about if Peggy was or wasn't home, that he would call again in

a minute. He stated then that he pretended to use the phone again. At this time he reached up and turned off the lights and started beating the babysitter.

"*Q.* Did he tell you with what he began beating her?

"*A.* With his hands.

"*Q.* Did he tell you how long?

"*A.* No. He said he beat her until he seen a light flash on the kitchen window—or the living room window.

"*Q.* He said he kept beating her until when?

"*A.* Till he seen a light flash on the living room window.

"*Q.* Would you please continue?

"*A.* He then jumped up and ran to the kitchen where he opened the window, pushed the screen out of the window and jumped out of the second-floor window and he picked himself up off the ground and ran through the alley to Alpine to—across the lot on Fourth Street —or Fifth Street of the Holiday Bar and north on the— or west on Nagold and then to his home.

"*Q.* And did he tell you what he did when he got home?

"*A.* Yes. The first thing he did is went to the bathroom and washed the blood off his person.

"*Q.* Then what—what next did he say?

"*A.* He then stated that he took his clothes and washed those and took his shirt which was all blood out to the trash burner and burned it out in the back yard.

"*Q.* Did he tell what clothes he took out to the back?

"*A.* Just the clothing—he just stated that it was the shirt he had on was the only clothing he burned. The rest of it he washed and dried.

"*Q.* Would you please continue?

"*A.* Then he stated he went up to his room and went to bed.

"*Q.* Did he say that anyone was at home when he got home?

"*A.* His mother.

"*Q.* Did he tell you whether or not he had any conversations with her?

"*A.* Yes.

"*Q.* What were they sir?

"*Mr. Pawlowski:* Objection to that.

"*Witness:* I can't answer that.

"*Mr. Zerial:* Why don't we let the judge decide?

"*The Court:* Objection overruled. This is what he told the officer so you may relate whatever he told you.

"*A.* His mother questioned him about the blood on his shirt and on his person and he reported or he stated to his mother than he had been in a fight."

The gravamen of defendant's argument concerning the trial testimony appears to be his allegation that such testimony failed to establish the crime of assault with intent to rape beyond a reasonable doubt, and that if our Court is not persuaded of his guilt of that offense beyond a reasonable doubt, his conviction on count one should be reversed. The fallacy of this argument is that it completely overlooks the proper standard to be applied in reviewing a trial court record for sufficiency of evidence to sustain the conviction on appeal. Our Court recently stated in *People v Knapp,* 34 Mich App 325, 332 (1971) as follows:

"The law is well established that the Court of Appeals is not a reviewing jury and does not hear cases anew on the evidence. *People v Eagger* (1966), 4 Mich App 449; *People v Bratton* (1969), 20 Mich App 523; and *People v Allen* (1970), 21 Mich App 109. The jury's determination is final if there is valid evidence before them to justify their verdict."

We determine that the testimony received at the trial in the instant case adequately establishes defendant's intent to rape, at the time he assaulted Miss Fortuna. The element of intent may be inferred from defendant's acts. *People v Gill,* 8 Mich App 89 (1967); *People v Leon Morgan,* 27 Mich App 388 (1970); *People v Peay,* 37 Mich App 414 (1971). Although defendant now suggests that

"the taking off of her clothes could have been for some other reason than to commit the crime of rape," he doesn't attempt to explain or define such "other reason." Considering all of defendant's behavior it was certainly sufficient to permit a reasonable jury to infer an attempt to rape on his part.

We find no error as to defendant's issue I.

## II.

Whether defendant's statements to the police after he was given his *Miranda* warnings which implicated him in the assault on the victim were properly admitted?

Defendant was arrested at a hotel for the misdemeanor charge of registering under a fictitious name. Defendant was given his *Miranda* warnings, waived his right to counsel and his privilege against self-incrimination, and implicated himself in the assault on the victim. Defendant contends that the failure of the police officers to advise defendant specifically that he was being questioned in regard to the sexual assault should preclude the use of such statements. The trial court disagreed. The defendant cites no authority holding that statements elicited during interrogation indicating the commission of a crime other than the one for which the defendant was arrested are not admissible into evidence. Defendant was properly advised of his rights. The trial judge ascertained in the *Walker* hearing that defendant knowingly waived such rights.

The law in Michigan is well settled that the findings and rulings of the trial judge at a *Walker* hearing will not be disturbed on appeal absent a plain showing "that they were clearly erroneous".

GCR 1963, 517.1; *People v Walker,* 6 Mich App 600 (1967); *People v Lauderdale,* 17 Mich App 191 (1969); *People v Lasley,* 21 Mich App 340 (1970); *People v William Turner,* 26 Mich App 632 (1970); *People v Kelly,* 30 Mich App 154 (1971).

The defendant has failed to establish that such findings and rulings were "clearly erroneous".

## III.

Whether prejudicial error was committed by the attorney for the people when he threw the bloody garments of the victim on the defense counsel's table?

The trial transcript discloses the facts concerning this issue as follows:

"*Q.* Mary, I ask you to look inside this bag. Have you ever seen this bag before right now?

"*A.* Just outside.

"*Q.* Just outside—

"*A.* Yesterday.

"*Q.* Did—did anyone show you the contents therein?

"*A.* No.

"*Q.* Okay. Would you look at Exhibit No. 5, people's proposed exhibit; do those items look familiar to you? Would you look inside it?

"*The Court:* Perhaps you can help her take things out.

"*(Witness crying.)*

"*A. (Witness complied with the request.)*

"*Q.* Mary, would you help me in identifying this piece of clothing?

"*A.* Yes.

"*Q.* What is that—what does that remind you of?

"*A.* That was the blouse that I was wearing.

"*Q.* Would you identify that for me, please?

"*A.* Those are the slacks.

"*Q.* Could you identify that?

*"A.* That is the girdle I was wearing.

*"Q.* Are these the panties—

*"A.* Yes.

*"Q.* —that you were wearing?

*"A.* Yes.

*"Q.* Is that the bra?

*"A.* Yes.

*"Mr. Zerial:* You may examine them.

*"(Mr. Zerial tossed the clothing on defense counsel table.)*

*"The Court:* Just a minute. Let's put it back in the bag, Mr. Zerial.

*"Mr. Pawlowski:* Mr. Zerial, I would appreciate—

*"The Court:* Just a moment. You don't need to go into anything. Put it—will you put it in the bag, please, Mr. Zerial?

*"Mr. Zerial:* I thought he might want to look at them, your Honor.

*"The Court:* If he does, he may take them out."

The action of the prosecutor was uncalled for and we frown upon such conduct. However, we rule that the trial judge cared for the situation properly and it did not constitute reversible error.

The defendant also asserts that the prosecutor made certain claimed improper statements to the jury on final argument. Defendant failed to make any objections to these claimed objectionable arguments at trial. In such a situation the law is clear; the comments or remarks of the prosecutor in oral arguments will not be considered on appeal in the absence of a timely objection thereto at the trial by the defendant. *People v Haley,* 48 Mich 495 (1882); *People v Giddings,* 159 Mich 523 (1910); *People v Savage,* 225 Mich 84 (1923); *People v Zesk,* 309 Mich 129 (1944); *People v Hancock,* 326 Mich 471 (1950); and *People v Edwards,* 35 Mich App 233 (1971).

We have carefully examined the now objected to

remarks of the prosecutor and find that they were not so prejudicial or improper as to call for reversal, especially in view of the fact that no objections were made at the trial. They did not call for any exceptions to the general rule that objections to oral argument not made at trial but made for the first time on appeal will not be considered. *People v Goldberg,* 248 Mich 553 (1929); *People v Connors,* 251 Mich 99 (1930).

### IV.

Whether or not the statements made by the prosecutor in closing argument in reference to the disposition of defendant on return of a verdict of not guilty by reason of insanity were prejudicially erroneous?

Defendant asserts that certain statements of the prosecutor were prejudicially erroneous in that they tended to destroy by fear the recognized defense of not guilty by reason of insanity.

The issue of defendant's disposition upon the return of a verdict has traditionally been a consideration for the court and not the jury. *People v Cole,* 382 Mich 695 (1969); *People v Williams,* 218 Mich 436 (1922). However, the maxim was cut back somewhat in *Cole, supra,* where the Court held that it is mandatory that an instruction concerning disposition after a verdict of not guilty by reason of insanity be given upon the request of either the defendant or the jury. The maxim was further reduced by the rule in *People v Singer,* 174 Mich 361 (1913), reiterated in *People v Dunn,* 380 Mich 693 (1968) that a prosecutor may comment to the jury on the disposition of defendant after verdict where it is in response to the defense attorney's argument respecting the same. Moreover, it is clear from the case of *People v Secorski,*

37 Mich App 486 (1972), that it is possible to correct error in commenting on disposition after verdict by an instruction from the court.

It is within this framework that the question of whether the prosecutor's statements in his closing argument were prejudicially erroneous must be reviewed.

The statements appear in the record as follows:

"Counsel brings up, if you come back by reason of—not guilty by reason of insanity that the defendant will go to a mental institution appropriate considered and according to the laws of the State of Michigan. That's right. But, all he has to do is, through some legal paper work ask to be released—

"*Mr. Pawlowski:* Well, now, wait a minute. Objection.

"*Mr. Zerial:* He brought it up on his argument, your Honor.

"*The Court:* You may proceed.

"*Mr. Zerial:* So all he has to do is say I am well now. I am well.

"*Mr. Pawlowski:* Mr. Zerial, you know this isn't true. Now why are you saying this?

"*Mr. Zerial:* A writ of *habeas corpus* and—

"*The Court:* Just a moment. I think I will restrict you on this. I think that the matter of what the procedures are in the hospital is far beyond the province of this jury. I will restrict you on that.

"*Mr. Zerial:* I think when opposing counsel brings up an argument that I am allowed to rebut it and I say that—

"*The Court:* You may proceed. I will restrict you on that."

It is clear that these remarks were in response to an argument made by defendant's counsel. As such, they were permissible. *People v Dunn* and *People v Singer, supra.* It is pertinent that while the prosecutor was on the verge of commenting on matters beyond the scope of *People v Singer, su-*

*pra,* he never really did so because he was not allowed to finish. The trial judge restricted him, and in so doing, made it very clear to the jury that the disposition procedures of the hospital were far beyond the province of the jury. Furthermore, the trial judge specifically told the jury that such matters were not within their province in the court's instructions:

"Now as I have indicated to you, you are not to base your verdict upon any speculation or guessing or surmising but base it upon the evidence as you have heard it and the exhibits as they have been received here in evidence. If you find the defendant guilty the ultimate punishment is not in your hands or disposition of the case, but that is in the sole discretion of the court. If you find him not guilty by reason of insanity, then it would be the duty of the court to commit him to the hospital authorities who would take over at that particular time. And I am not going to try to outline for you each and every possible verdict but I believe I have given you enough instruction so that you understand them."

This instruction clearly defined the boundaries within which the jury was permitted to consider the defense of not guilty by reason of insanity. They were specifically told that they were not to speculate, guess, or surmise on anything. It was made clear that regardless of whether the verdict was guilty or not guilty by reason of insanity or any other verdict, the ultimate disposition of the case was not in their hands but rather that of the court or of the hospital authorities. Accordingly, any prejudice that may have arisen from the prosecutor's statements was effectively alleviated.

Defendant asserts that the cases of *People v Lewis,* 37 Mich App 548 (1972), and *People v Secorski, supra,* are dispositive of the instant case. Because of the different issues and factual situa-

tions in those cases, they must be considered separately.

In *People v Lewis, supra,* at 551–552 the prosecutor made the following remarks to the jury in rebuttal to an argument of defendant's counsel:

" 'Now how long will he stay if he is found not guilty by insanity. How long will he stay in Ionia? We don't even know; today if a psychiatrist would look at him today, this Friday, whether they might not say he is sane. Keep in mind this is strictly an opinion, just a judgment; I would say that they would say he is sane, or next week he goes to the institution thereafter, because see all he has to do is to show he is sane at this point he can tell the psychiatrist I fooled them, I did it, I knew I was doing it, just lay it right on the line, he has nothing to lose. What are they to say, by golly you did, we are going to keep you anyway, they can't keep him, because if he is sane they have to release him and he is right back out in the street again. So we are caught in the same judgment problem that we have in determining in the initial instance whether he was insane. He could just as easily be determined sane, or in the meantime if he has a kind of temporary insanity, if you will, then you believe that he was only insane just at that moment, he is sane now, then if he is sane now, he doesn't have to stay in the hospital, *he can go out and shoot somebody else,* he can then have another phase of temporary insanity, if you will, uncontrollable impulse, irresistible impulse; in other words, *you give him a license to kill.'* (Emphasis supplied.)"

Even though they were in response to an argument by defendant's counsel, the court found the statements, "he can go out and shoot somebody else" and "you give him a license to kill" to be so highly inflammatory that a reversal was warranted. The Court went on to indicate that these types of statements were not the kind that could be cured by an instruction from the trial judge.

The facts of the *Lewis* case can be clearly distin-

guished from the instant case. No such inflammatory remarks were made herein, and the statements that were made were of the kind that could be cured by instruction.

In *People v Secorski, supra,* at 488, the prosecutor, during his opening statement, made the following statement to the jury:

" *'Prosecutor:* Why this insanity defense, it is just so that you can have an excuse to find the defendant not guilty of this cold-blooded deliberate well-planned murder. Executed by a man who laid in wait and who thought he had a license to kill, and a license to get away with it. He felt all he had to do was take the stand in front of the jury and tell them that he was defending his marriage, and he thought all he had to do was tell the jury that *they could find him insane and set him free.'* (Emphasis supplied.)"

After the conclusion of the prosecutor's opening statement, defense counsel requested the trial judge to instruct the jury that the defendant would be confined in an institution until adjudged sane if found not guilty by reason of insanity. The trial judge announced that he would so instruct when he informed the jury of possible verdicts. However, he neglected to include the instruction among his charges to the jury.

The Court held that in making the statement, the prosecutor violated the principle that he may not, unless provoked, refer to the defendant's disposition on return of a verdict. *People v Dunn, supra.* It is pertinent that if the trial in *Secorski* had not predated the case of *People v Cole, supra,* this latter case would have been controlling there.

It is clear that the instant case is clearly distinguishable because the statements were made in response to an argument made by defense counsel. Furthermore, it is noteworthy that the defendant

could have had the benefit of a *Cole, supra,* instruction if he thought it necessary or desirable.

Both of these cases being distinguishable on the facts, they are inapplicable to the instant case.

Affirmed.

All concurred.