PEOPLE v HALL

1. CRIMINAL LAW—CROSS-EXAMINATION—BELIEF IN GOD—APPEAL AND
   ERROR—CONSTITUTIONAL LAW—STATUTES.

   Questioning a defendant in cross-examination as to his belief in
   God is clear error; the Michigan Constitution and the Legisla-
   ture have forbidden that questions of such nature be asked
   during the course of a criminal proceeding (Const 1963, art 1,
   § 18; MCLA 600.1436).

2. CRIMINAL LAW—NEW TRIAL—CROSS-EXAMINATION—BELIEF IN GOD
   —APPEAL AND ERROR—STATUTES.

   A new trial is mandated where a prosecutor questioned a defend-
   ant during cross-examination in a criminal case as to his belief
   in God although no objection to the question appears on the
   record; if the Michigan Supreme Court were, on a case by case
   basis, to evaluate the entire record to determine if prejudice or
   "manifest injustice" occurred therein because of this type of
   question, it would emasculate the statute, providing that no
   witness may be questioned in relation to his opinions on
   religion, and the legislative intent behind it (MCLA 600.1436).

3. CRIMINAL LAW—SPEEDY TRIAL—DELAY—DEMAND FOR TRIAL—PREJ-
   UDICE.

   Four factors are balanced to determine whether or not a defend-
   ant was denied his right to speedy trial; they are: length of
   delay, the reason for the delay, the defendant's assertion of his
   right and prejudice to the defendant.

4. CRIMINAL LAW—SPEEDY TRIAL—DEMAND FOR TRIAL—OVERRULED
   CASES.

   *People v Duncan,* 373 Mich 650 (1964), and *People v Miklovich,*
   375 Mich 536 (1965), insofar as they held a demand by the
   defendant for a trial was a prerequisite to the assertion of the

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 58 Am Jur, Witnesses § 126.
[3–6] 21 Am Jur 2d, Criminal Law §§ 245, 253, 254.
[7–9, 11] 50 Am Jur, Statutes § 363.
[10, 12–14] 36 Am Jur 2d, Forgery § 31.
   41 Am Jur 2d, Indictments and Informations §§ 89, 90.

right to speedy trial, were overruled by *Barker v Wingo,* 407 US 514 (1972), *People v Grimmett,* 388 Mich 590 (1972), and *People v Collins,* 388 Mich 680 (1972).

5. CRIMINAL LAW—SPEEDY TRIAL—PREJUDICE—FORGERY—UTTERING AND PUBLISHING—CHECKS—ALTERING CHECK.

Defendant's claim of prejudice resulting from a ten-month delay in his trial for uttering and publishing a check altered in amount is not well founded in its legal ramifications where he asserted that but for the delay, a witness may have testified that defendant did not sign the check in the witness's presence because whether or not defendant actually signed the check was immaterial; the only essential element of that crime was that in fact defendant had cashed the check (MCLA 750.249).

6. CRIMINAL LAW—SPEEDY TRIAL—DELAY—DEMAND FOR TRIAL—PREJ-UDICE.

Defendant was not denied his constitutional right to a speedy trial because of a ten-month delay in his trial where the state asserted no reason for the delay and defendant made no de-mand for speedy trial since the ten-month period of time was not so inherently prejudicial in and by itself as to require dismissal and the defendant's claim of prejudice is not well founded.

7. CRIMINAL LAW—STATUTES—CONSTRUCTION.

Penal statutes are to be strictly construed; the fact that these types of statutes are narrowly construed does not require rejection of that sense of the words which best harmonizes with the overall context of the statutes and the end purpose sought to be achieved by such legislation; with criminal statutes, such end purpose is the evil sought to be corrected and the objects of the law sought to be effectuated.

8. STATUTES—CONSTRUCTION—SUPREME COURT—LEGISLATURE—PRE-SUMPTIONS.

The Michigan Supreme Court will presume that the Legislature of the State of Michigan is familiar with the principles of statutory construction.

9. CRIMINAL LAW—STATUTES—CONSTRUCTION—FORGERY—UTTERING AND PUBLISHING.

One of Michigan's most honored and longstanding principles of statutory construction is that literal interpretations, and the inferences drawn therefrom, arising from general provisions of a statute or statutory section must be read so as to be limited and controlled by clear and express language found in other

sections of the same statute; accordingly, the general provisions regarding forgery and uttering and publishing must be read so as to be limited by the specific provisions which follow those general provisions (MCLA 750.248–750.254).

10. FORGERY—UTTERING AND PUBLISHING—DISTRICT AND PROSECUTING ATTORNEYS—INDICTMENT AND INFORMATION.

Under the statutes on forgery and uttering and publishing, properly construed, it is not possible for the prosecutor to pick and choose under which statute he will prosecute because the items set forth in the sections on forgery of notes issued for debt of state, forgery of bank bills and notes, uttering counterfeit notes, and possession of counterfeit bank bills are indictable solely under those sections and not under the section on forgery of records and other instruments and the section on uttering and publishing forged instruments (MCLA 750.248–750.254).

11. STATUTES—CONSTRUCTION.

Where the language of a statute is obscure or of doubtful meaning, the courts in construing it may, with propriety, recur to the history of the times when it was passed and of the act itself in order to ascertain the reason as well as the meaning of its provisions and it may also consider all conditions and circumstances surrounding its enactment in the light of the general policy of previous legislation on the same subject.

12. FORGERY—UTTERING AND PUBLISHING—BANK BILLS—BANK NOTES —CURRENCY—NATIONAL BANK ACT—FEDERAL RESERVE ACT.

The proper interpretation of the phrase "bank bill or promissory note" as used in statutes prescribing penalties for forgery and uttering and publishing shall be such that the phrase includes only those items of modern day commerce known as common currency and as described and delineated in the National Bank Act and the Federal Reserve Act; accordingly, the Legislature's action in treating these items of commerce differently from items of personal and private commerce was justified and with a rationale basis (12 USCA 103 *et seq.*, 12 USCA 411 *et seq.*; MCLA 750.248–750.254).

13. FORGERY—OTHER INSTRUMENT—STATUTES—CONSTRUCTION—STATE NOTES—LOCAL NOTES—CERTIFICATES—BONDS—WARRANTS.

The phrase "or other instrument" as used in statutes prescribing penalties for falsely making, altering, forging or counterfeiting and uttering and publishing any note, certificate, bond, warrant or other instrument issued by the state or any of its political

subdivisions or municipalities, under the rule of *ejusdem gene-ris,* includes only those instruments of the same general character, sort, or kind as those specifically referred to in the statute; therefore, only instruments similar to state and local notes, certificates, bonds and warrants fall within the confines of that statute (MCLA 750.250 *et seq.).*

14. FORGERY—UTTERING AND PUBLISHING—EQUAL PROTECTION—CONSTITUTIONAL LAW—BONDS—NOTES—BANK BILLS.

The uttering and publishing scheme of Michigan, whereby a 14-year term is provided for uttering and publishing forged instruments and a 5-year term is provided for uttering and publishing any false, altered, forged or counterfeit bond, note or other instrument issued by the state or any of its political subdivisions or municipalities or any bank bill or promissory note issued by the state or any of its governmental units or issued by any incorporated banking company, does not violate equal protection of the laws as guaranteed by the Federal and state Constitutions; the Michigan Supreme Court cannot say that it is irrational for the Legislature to punish that offense less likely to have a severe impact on our society more lightly, and prescribe a higher penalty for that offense more likely to cause the greater harm (MCLA 750.249, 750.253).

Appeal from Court of Appeals, Division 1, Bronson, P. J., and V. J. Brennan and O'Hara, JJ., affirming Recorder's Court of Detroit, Henry L. Heading, J. Submitted November 8, 1973. (No. 11 November Term 1973, Docket No. 54,261.) Decided February 27, 1974.

39 Mich App 558 reversed.

James D. Hall was convicted of uttering and publishing a check altered in amount. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed and remanded for a new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Leonard Meyers,* Assistant Prosecuting Attorney, for the people.

*State Appellate Defender Office* (by *Roger L. Wotila)*, for defendant on appeal.

Amicus Curiae: *Prosecuting Attorneys Appellate Service* (by *Aloysius J. Lynch)* and *Prosecuting Attorneys Association.*

T. M. KAVANAGH, C. J. This case is before us on leave granted, 389 Mich 798 (1973), from a decision of the Court of Appeals, 39 Mich App 558; 197 NW2d 870 (1972) affirming defendant's jury conviction for uttering and publishing. The facts on appeal are uncomplicated.

On April 10, 1969 defendant purportedly cashed an altered payroll check with the Travelers' Express Company. The state maintained that he had altered his paycheck by changing the amount payable from $22.90 to $221.90 and passed it with intent to defraud. Defendant was found guilty of violation of MCLA 750.249; MSA 28.446 and sentenced by the trial court to a term of 5 to 14 years.

On appeal defendant raises three issues, as follows:

1. Whether the prosecutor denied appellant a fair trial by deliberately cross-examining as to his belief in God in violation of MCLA 600.1436; MSA 27A.1436.

2. Whether appellant was denied his constitutional right to a speedy trial.

3. Whether the Michigan statutory scheme regarding uttering and publishing violates equal protection of the laws as guaranteed by the state and Federal Constitutions.

ISSUE I—THE IMPROPER CROSS-
EXAMINATION

During the course of the prosecutor's cross-ex-

amination of defendant, the following exchange took place before the jury:

"*Prosecutor:* I forgot to ask you, Mr. Hall, whether or not you believe in the Supreme Being?
"*Mr. Hall:* Yes, I do."

A reading of the entire exchange reveals that, by his question above, the prosecutor was obliquely trying to remind the defendant that he was under oath. His next question reveals the purpose behind his question:

"*Mr. Prosecutor:* You do. And you would not tell a falsehood to save yourself?
"*Mr. Hall:* I beg your pardon?
"*Mr. Prosecutor:* Would you tell a falsehood to get out of this crime, sir?[1]
"*Mr. Hall:* Would I lie, is that what you mean?
"*Prosecutor:* Yes, sure. To help your case?
"*Mr. Hall:* I don't—I don't know.
"*Prosecutor:* Would you tell a falsehood in order to get out of this case? Yes or no?
"*Mr. Hall:* I don't know. I couldn't answer that.
"*Prosecutor:* You couldn't answer that?
"*Mr. Hall:* No."

The prosecutor prefaced this line of questioning by inquiring into the religious belief of the defendant. By so doing he insinuated to the jury that the veracity of defendant's testimony was somehow correlated to the strength and conviction of de-

---

[1] Hall does not separately challenge the "would you tell a falsehood to save yourself" questions and, therefore, we have no occasion to comment on the propriety of that line of questioning. Justice LEVIN, for a panel of the Court of Appeals has expressed the view that it is improper because the question is hypothetical and argumentative: "The pertinent inquiry was whether the witness was lying or telling the truth during his testimony in chief, not what he might do in all events and circumstances." *People v Williams,* 39 Mich App 458, 462; 197 NW2d 858 (1972).

fendant's religious beliefs. He implied that one who believes in God is apt to be more truthful than one who does not. If this is to be permitted, there is no logical reason why the prosecutor may not then inquire into the nature of defendant's religion. Would it not follow that perhaps some religions may have a greater reputation for truth and veracity than others? The criminal trial would revert to no more than a modern day inquisition; with the defendant being tried, convicted and punished on the nature of his religious beliefs.

Our Constitution states (Const 1963, art 1, § 18):

"No person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief."

Further, our statute (MCLA 600.1436; MSA 27A.1436) states:

"No person may be deemed incompetent as a witness in any court, matter or proceeding, on account of his opinions on the subject of religion. No witness may be questioned in relation to his opinions on religion, either before or after he is sworn."

This statute leaves little room for discussion by this Court as to whether or not this cross-examination was improper. It clearly was so. As Justice CHRISTIANCY, in *People v Jenness,* 5 Mich 305, 319 (1858) stated:

"Under this section,[2] it was clearly incompetent to question the witness in this case, in reference to her belief in a God, unless it can be shown that belief or disbelief in a God has no reference to 'opinions on the subject of religion.' Belief is a stronger term than

[2] 1857 CL 4336. This statute is the precursor of MCLA 600.1436; MSA 27A.1436. There is no significant change in the statute in its present form.

opinion, and necessarily includes the latter. Belief or
opinion in reference to the existence or non-existence of
a Supreme Being, is, we think, not only a belief or
opinion 'on the subject of religion,' but on the most
important of all subjects of religion, and that which
controls and gives form to all other religious opinions.
We think, therefore, *it was clearly the intention of the
legislature to prevent the first step,* and every subse-
quent step, in all inquiries of this kind; * * * ." (Em-
phasis added.)

This Court fully agrees with Justice CHRISTI-
ANCY. The constitution and our Legislature have
forbidden that questions, of the nature with which
we are here presented, be asked during the course
of a criminal proceeding. The asking of such a
question is clear error.

The state argues, and it was so held by the
Court of Appeals, that since no objection to the
question appears on the record, and since "mani-
fest injustice" was not shown, this type of error
does not require reversal. We disagree. If we were,
on a case by case basis, to evaluate the entire
record to determine if prejudice or manifest injus-
tice occurred therein because of this type of ques-
tion, we would emasculate our statute and the
legislative intent behind it. Our statute clearly
states that an accused is entitled to be tried and
convicted without the question of his religious
opinions ever being put in front of the judge or
jury for their consideration. Whether the defend-
ant hesitates, or unhesitatingly responds nega-
tively or positively, or if he should quite properly
refuse to respond, he still cannot avoid the risk of
stimulating an offensively prejudicial reaction in
some quarter of the jury. This Court feels that it is
inappropriate for it to take it upon itself to deter-
mine whether or not such prejudicial reaction did
in fact occur, when our statute clearly attempts to

foreclose such review by forbidding the asking of the prejudicial question itself. A defendant is entitled to a trial free of such improper questions. Once the question is asked, this is no longer possible. A new trial is mandated.

## ISSUE II—RIGHT TO SPEEDY TRIAL

The defendant was arraigned on July 26, 1969. Examination was held during August, 1969. A motion was made by defendant's trial attorney for procurement of a handwriting expert on October 8, 1969; the motion being granted on October 10, 1969. On June 2, 1970 the defendant's trial attorney requested an adjournment of the trial date and trial was finally held September 24, 1970. From July 26, 1969 through June 2, 1970 there were no motions to delay or adjourn. The state alleges no reason for this delay. Defendant, however, free on bond, made no request for speedy trial.

As the United States Supreme Court stated in *Barker v Wingo,* 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972), four factors are balanced to determine whether or not appellant was denied his right to speedy trial. They are "length of delay, the reason for the delay, the defendant's assertion of his right and prejudice to the defendant." See also *People v Collins,* 388 Mich 680; 202 NW2d 769 (1972) and *People v Chism,* 390 Mich 104; 211 NW2d 193 (1973).

In ruling on this issue below, the Court of Appeals held that, since no demand for trial was made, *People v Duncan,* 373 Mich 650; 130 NW2d 385 (1964) and *People v Miklovich,* 375 Mich 536; 134 NW2d 720 (1965) precluded appellate review of the speedy trial issue. After the Court of Appeals' decision was handed down, the United

States Supreme Court decided *Barker v Wingo, supra,* and this Court handed down *People v Grimmett,* 388 Mich 590; 202 NW2d 278 (1972) and *People v Collins, supra.* These latter cases overruled *People v Duncan, supra,* and *People v Miklovich, supra,* insofar as they held that a demand by the defendant for trial was a prerequisite to the assertion of the right to speedy trial.

Since, under our new rule, demand by the defendant for a speedy trial is but one of the elements looked at by the Court in determining whether or not this right was abridged, we proceed to evaluate the case on the merits as to this issue.

The delay in this case was from the date of the arraignment, July 26, 1969 until June 2, 1970 when defendant's attorney requested the trial adjourned, a period of approximately ten months. Under the rationale of *People v Chism, supra,* this length of delay is sufficient for us to examine the other factors that go into the balance.

The state asserts no reason for the ten-month delay. Defendant made no demand for speedy trial. Thus, since the ten-month period of time is not so inherently prejudicial in and by itself as to require dismissal, the controlling element in this case must be the prejudice to the defendant caused by this delay.

Appellant's only substantial claim as to prejudice suffered by the ten-month delay is prejudice to his defense at trial. As part of the prosecution's case, the man who cashed the altered check was called as a witness. When asked, however, if appellant had signed the check in his presence, the witness testified he couldn't remember. Appellant cites to us the following portion of the transcript to demonstrate this presumed prejudice.

"*Q. [Prosecutor]* You say he presented the check, and

do you remember now whether or not the check was signed in your presence?

"*A. [Complaining Witness]* I am almost sure it was. Because otherwise we don't allow any check cashing, unless they are signed in our presence. And if it's already signed, they would have to endorse it over again.

"*Q.* But you are not positive whether this defendant signed it in-your presence?

"*A.* It's so long ago I won't swear to it."

Appellant asserts that but for the delay, the witness may have testified that appellant did not sign the check in his presence. From this he attempts to show prejudice. However, appellant's argument fails in that it does not recognize that whether or not appellant signed the check *at all* is immaterial to this prosecution. Appellant was tried and convicted for uttering and publishing a check *altered in amount* from $22.90 to $221.90. The check was made payable to J. D. Hall and, as shown by the testimony cited above, appellant James D. Hall cashed the check in person. The check was not a forgery because one other than the true payee cashed it; it was a forgery because the amount payable was altered. Whether or not appellant actually signed the check was immaterial to this prosecution for uttering and publishing.

The witness testified clearly as to the only essential element of this crime, that it was in fact James D. Hall that cashed this check. *People v Brigham,* 2 Mich 550 (1853). Thus appellant's claim of prejudice is not well founded in its legal ramifications.

A review and a balancing of the four factors stated above leads this Court to find that appellant was not denied his constitutional right to a speedy trial in this case.

ISSUE III—THE CONSTITUTIONALITY OF THE
MICHIGAN UTTERING AND PUBLISHING
SCHEME

The following statutes[3] constitute the Michigan
uttering and publishing scheme. Appellant argues
that, taken as a whole, these statutes violate the
equal protection of the law guaranteed by our
state and Federal constitutions.

"Sec. 248. (1) Any person who shall falsely make,
alter, forge or counterfeit any public record, or any
certificate, return or attestation of any clerk of a court,
public register, notary public, justice of the peace, town-
ship clerk, or any other public officer, in relation to any
matter wherein such certificate, return or attestation
may be received as legal proof, or any charter, deed,
will, testament, bond or writing obligatory, letter of
attorney, policy of insurance, bill of lading, bill of
exchange, promissory note, or any order, acquittance of
discharge for money or other property, or any waiver,
release, claim or demand, or any acceptance of a bill of
exchange, or indorsement, or assignment of a bill of
exchange or promissory note for the payment of money,
or any accountable receipt for money, goods or other
property, with intent to injure or defraud any person,
shall be guilty of a felony, punishable by imprisonment
in the state prison not more than 14 years.

"(2) The venue in a prosecution under this section
may be either in the county in which the forgery was
performed, or in a county in which any false, forged,
altered or counterfeit record, deed, instrument or other
writing is uttered and published with intent to injure or
defraud.

"Sec. 249. Uttering and publishing forged instru-
ments—Any person who shall utter and publish as true,
any false, forged, altered or counterfeit record, deed,
instrument or other writing mentioned in the preceding
section, knowing the same to be false, altered, forged or

---

[3] MCLA 750.248–750.251, 750.253–750.254; MSA 28.445–28.448,
28.450–28.451.

counterfeit, with intent to injure or defraud as afore-
said, shall be guilty of a felony, punishable by imprison-
ment in the state prison not more than 14 years.

"Sec. 250. Forgery of notes, etc., issued for debt of
state—Any person who shall falsely make, alter, forge
or counterfeit any note, certificate, bond, warrant or
other instrument, issued by the treasurer or other
officer authorized to issue the same, of this state, or any
of its political subdivisions or municipalities, with in-
tent to injure or defraud as aforesaid, shall be guilty of
a felony, punishable by imprisonment in the state
prison not more than 7 years.

"Sec. 251. Forgery of bank bills and notes—Any
person who shall falsely make, alter, forge, or counter-
feit any bank bill or promissory note payable to the
bearer thereof, or to the order of any person, issued by
this state, or any of its political subdivisions or munici-
palities or by any incorporated banking company in this
state, or in any of the British provinces of North
America, or in any other state or country, or payable
therein, at the office of any banking company incorpo-
rated by any law of the United States or of any other
state, with intent to injure or defraud any person, shall
be guilty of a felony, punishable by imprisonment in
the state prison not more than 7 years.

"Sec. 253. Uttering counterfeit notes, etc.—Any per-
son who shall utter or pass, or tender in payment as
true, any such false, altered, forged or counterfeit note,
certificate or bill of credit for any debt of this state, or
any of its political subdivisions or municipalities, any
bank bill or promissory note, payable to the bearer
thereof, or to the order of any person, issued as afore-
said, knowing the same to be false, altered, forged or
counterfeit, with intent to injure or defraud as afore-
said, shall be guilty of a felony, punishable by imprison-
ment of not more than 5 years or by fine of not more
than 2,500 dollars.

"Sec. 254. Possession of counterfeit bank bills, etc.—
Any person who shall bring into this state, or shall
have in his possession, any false, altered, forged or
counterfeit bill or note in the similitude of the bills or
notes payable to the bearer thereof, or to the order of
any person issued by or for this state, or any of its

political subdivisions or municipalities, or any bank or banking company, established in this state, or in any of the British provinces in North America, or in any other state or country, with intent to utter or pass the same, or to render the same current as true, knowing the same to be false, forged or counterfeit, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years, or by fine of not more than 2,500 dollars."

Appellant was tried and convicted under § 249, *supra,* and sentenced to a maximum term of 14 years. He now contends that this statutory scheme violates equal protection of the laws in that the different classifications, bills of exchange versus bank bills, which mandate different punishments (14 years under § 249 and 5 years or a fine only under § 253) are arbitrary distinctions without a reasonable relationship to the purpose of the statutes, and are not based on a rational basis made up of material differences and substantial distinctions.

Appellant essentially sets forth a two-fold argument by his attack on these Michigan statutes. First, his argument assumes that §§ 249 and 253 both prohibit the uttering and publishing of the same type of commercial paper, notes, etc., thus allowing the prosecutor unbridled discretion as to which of the two statutes he will prosecute under. Secondly, his argument asserts that if indeed §§ 249 and 253 each prohibit the uttering and publishing of different forms of commercial paper, there is no rational basis for the marked differences in penalties prescribed by the Legislature for violation of the separate statutes.

At first glance it might appear that perhaps § 249, prohibiting the uttering and publishing of the items set forth in § 248 and § 253, prohibiting the uttering and publishing of bank bills and

notes, both prohibit the uttering and publishing of the same items. Sections 248 and 249 are general statutory provisions, prohibiting the forgery and the uttering and publishing of most types of written instruments and of all negotiable instruments. Included within the prohibitions of §§ 248 and 249 are any bond, or written obligatory, bill of exchange and promissory note.

Section 250 prohibits the forgery of any bond, note or other instrument, limiting however its proscription to those issued by the state or any of its political subdivisions or municipalities. Section 251 solely prohibits the forgery of any *bank bill or promissory note* issued by this state or any of its governmental units or issued by any incorporated banking company. Section 253 consolidates the items set forth in §§ 250 and 251 and prohibits uttering and publishing of same. It is noted by this Court that the items set forth in §§ 250, 251 and 253 are of a more specific nature than those covered under §§ 248 and 249.

It is argued, however, that these items are also covered by the general provisions of §§ 248 and 249, dealing with *any* promissory note, bill of exchange, bond, etc. Since the penalties attached to these different sections are, however, markedly different, it is apparent that interpretation by our Court is essential if these statutes are to survive constitutional scrutiny.

We begin our review of these statutes by affirming our previous holdings that penal statutes are to be strictly construed. *Lansing v Brown,* 172 Mich 50; 137 NW 535 (1912); *People v Goulding,* 275 Mich 353; 266 NW 378 (1936). However, as the Court pointed out in *People v Consumers Power Co,* 275 Mich 86; 265 NW 785 (1936), the fact that these types of statutes are narrowly construed

does not require rejection of that sense of the words which best harmonizes with the overall context of the statutes and the end purpose sought to be achieved by such legislation. With criminal statutes, such end purpose is the evil sought to be corrected and the objects of the law sought to be effectuated. *Hightower v Detroit Edison Co,* 262 Mich 1; 247 NW 97; 86 ALR 509 (1933).

This Court will presume that the Legislature of this state is familiar with the principles of statutory construction. *People v Lowell,* 250 Mich 349; 230 NW 202 (1930). One of our most honored and longstanding such principles is that literal interpretations, and the inferences drawn therefrom, arising from general provisions of a statute or statutory section must be read so as to be limited and controlled by clear and express language found in other sections of the same statute. *Bidwell v Whitaker,* 1 Mich 469 (1850); *McDade v People,* 29 Mich 50 (1874). Accordingly, we find that the general provisions of §§ 248 and 249 must be read so as to be limited by the specific provisions of § 250, *et seq.* As we stated in *Bidwell, supra,* "the inferences to be drawn from a literal interpretation of the first section must be controlled by the clear and express language to be found in other sections of the same statute". 1 Mich 469, 479.

Appellant's first argument thus fails. It is not possible under these statutes, properly construed, for the prosecutor to pick and choose under which statute he will prosecute. The items set forth in § 250, *et seq.* are indictable solely under those sections, and not under §§ 248 and 249. Appellant does not argue that he was convicted of uttering and publishing an item not properly prohibited under § 249.

Applying this fundamental rule of statutory interpretation does not, however, answer all of the issues raised. We are still confronted with the fact that § 250, *et seq.,* now apparently segregate from the control of §§ 248 and 249 all bank bills or promissory notes, plus various instruments issued by the state and other governmental bodies. Appellant asserts that, for example, it is irrational to receive a 14 year penalty for passing a forged personal check, but a maximum of 5 years for passing a forged cashiers' check or other bank draft. However, appellant is erroneous in stating that such a result is possible under our statutory scheme. His basic misconception is founded on an erroneous interpretation of "bank bill or promissory note" as that term is used in §§ 251 and 253. Appellant assumes that those terms refer to items found in modern day commerce, such as are set forth in Articles 3 and 4 of our Uniform Commercial Code.

As the Sixth Circuit Court of Appeals stated in *Genesee Trustee Corporation v Smith,* 102 F2d 125, 126 (CA 6, 1939):

"Where the language of a statute is obscure or of doubtful meaning, the courts in construing it may, with propriety, recur to the history of the times when it was passed and of the act itself in order to ascertain the reason as well as the meaning of its provisions and it may also consider all conditions and circumstances surrounding its enactment in the light of the general policy of previous legislation on the same subject. *The Delaware,* 161 U.S. 459, 474, 16 S. Ct. 516, 40 L. Ed. 771 [1896]; *Platt v Union Pacific Railroad,* 99 U.S. 48, 67, 25 L. Ed. 424 [1878]."

A review of the cases founded upon the statutes in question, as well as our examination of those statutes and of the state of the time when these

statutes were first passed in 1838[4], leads the Court
to conclude that the terms "bank bills or promis-
sory notes" refer to items of commerce which,
although of a slightly different nature back in the
1800's, have come down to modern times in the
form of our national currency.

In their original form, §§ 248 and 249 read
essentially the same as they do today. Both statu-
torily dealt with essentially the same items pro-
scribed by these sections today, and for both the
Legislature had set forth 14 year maximum penal-
ties. However, §§ 250, 251, 253, although dealing
with the same basic items as those sections do
today, show marked differences by the Legislature
in their treatment of the punishment provided.
These sections originally read as follows:

"Sec. 3. Every person who shall falsely make, alter,
forge or counterfeit any note, certificate or other bill of
credit, issued by the treasurer of this state, or by any
commissioner or other officer authorized to issue the
same, for any debt of this state, with intent to injure or
defraud as aforesaid, shall be punished by imprison-
ment in the state prison for life, or for any term of
years.

"Sec. 4. Every person who shall falsely make, alter,
forge or counterfeit any bank bill or promissory note,
payable to the bearer thereof, or to the order of any
person, issued by any incorporated banking company in
this state, or payable therein, at the office of any
banking company incorporated by any law of the
United States or of any other state, with intent to
injure or defraud any person, shall be punished by
imprisonment in the state prison for life, or for any
term of years."

"Sec. 6. Every person who shall utter or pass, or
tender in payment as true, any such false, altered,
forged or counterfeit note, certificate or bill of credit,
for any debt of this state, any bank bill or promissory

_____
[4] RS 1838, Part Fourth, Title 1, ch 5, §§ 1–7.

note, payable to the bearer thereof or to the order of
any person, issued as aforesaid, knowing the same to be
false, altered, forged or counterfeit, with intent to in-
jure or defraud as aforesaid, shall be punished by
imprisonment in the state prison not more than five
years, or by fine not exceeding one thousand dollars,
and imprisonment in the county jail not more than one
year.

"Sec. 7. If any person who has been convicted of the
offence mentioned in the preceding section, shall be
again convicted of the offence, committed after the
former conviction, or if any person shall, at the same
term of court, be convicted upon three distinct charges
of the same offence, he shall be deemed a common
utterer of counterfeit bills, and shall be punished by
imprisonment in the state prison not more than ten
years."

As shown, §§ 250 and 251 originally carried as
penalty for their violation imprisonment for life or
for any term of years. Section 253, while carrying
the present five-year penalty, had attached to it a
"common utterer" statute providing a ten-year
penalty for repeated violations for multiple
counts.[5]

Our Legislature in 1846 evidently seriously re-
viewed the question of what was an appropriate
penalty for violation of §§ 250, 251 and 253 and
that decision continues to be reflected in our pres-
ent day statutes. We now seek to discern a ra-
tional basis for the continued disparity in penalty.

Section 253, the crucial section of our statute
under attack in the instant case, prohibits the
uttering and publishing of two separate and dis-
tinct types of items. First, it prohibits the uttering

---

[5] The life penalty provisions are removed by our Legislature by RS
1846, ch 155, §§ 1–7 and the multiple offender statute was repealed
and the statutes amended to their present day form by 1931 PA 328,
§§ 248–253, as amended by 1934 PA (Ex Sess) 16; 1964 PA 101, § 1;
1967 PA 64, § 1.

and publishing of those items set forth in § 250, *i.e.,* instruments issued by the state and other governmental bodies, and secondly, it prohibits the uttering and publishing of those items set forth in § 251, bank bills or promissory notes. Each of these types of items will now be reviewed separately by this Court in order to determine whether or not any rational basis for the Legislature's special handling of those items may be found to exist.

A definition of the term "bank bill or promissory note" is essential for a full understanding of our Legislature's handling of this matter. In 10 Am Jur 2d, Banks, § 320, pp 285–286, it is stated:

"Bank notes or bank bills (the terms are used interchangeably) are the promissory notes of a bank to pay to the bearer a certain sum on demand. They are intended to pass, and do pass, according to the prevailing view, as money or common currency for an indefinite period, wherein lies the most important distinction between such notes and ordinary promissory notes payable on demand."

In *Bank of the United States v Bank of Georgia,* 23 US (10 Wheat) 333; 6 L Ed 334 (1825), the United States Supreme Court spoke on the differences between bank bills and notes and bills of exchange. The Court stated, p 347:

"Bank notes constitute a part of the common currency of the country, and ordinarily pass as money. When they are received as payment, the receipt is always given for them as money. They are a good tender as money, unless specifically objected to; and as Lord Mansfield observed in *Miller v Race,* (1 *Burr Rep.* 457 [1758]), they are not like bills of exchange, considered as mere securities or documents for debt."[6]

---

[6] For a further explanation of the term "bank bills and notes" and a study of their place in our Nation's history, see also the facts presented the Court in *M'Culloch v Maryland,* 17 US (4 Wheat) 316; 4

This Court cannot help but hold that, with such eminent precedent existing at the time of passage of our statutes, our Legislature adopted this definition when it passed the precursor of §§ 251 and 253[7]. Accordingly, we find that the term "bank bill or promissory note" as used in §§ 251 and 253 may be defined as common currency or money, as that term is used today. In reenacting these statutes into their present form this Court feels that our Legislature was cognizant of the National Bank Act provisions, § 2, 40 Stat 342 (1917), 12 USCA 101 *et seq.,* and of the provisions of the Federal Reserve Act, § 16, 38 Stat 265 (1913), 12 USCA 411 *et seq.* The aforesaid acts detail the role the banks today play in the issuance of our Nation's currency.

Under these Federal statutes, our Nation's currency may properly be termed "bank bills and notes" as that term is used in §§ 251 and 253 of our Code.[8]

This Court therefore holds that the proper interpretation of the phrase "bank bills and notes" shall be such that the phrase includes only those items of modern day commerce known as common currency and as such described and delineated in the above stated Federal statutes. Accordingly we cannot find that the Legislature's action in treating these items of commerce differently from items of personal and private commerce was unjustified or without any rational basis. Appellant's argument on this point must necessarily fail.

L Ed 579 (1819); *Van Allen v The Assessors,* 70 US (3 Wall) 573; 18 L Ed 229 (1865); 2 Zollman, Banks and Banking, § 631 *et seq.*

[7] For early Michigan prosecutions under § 250 *et seq.,* which reinforce this definition *see People v Stewart,* 4 Mich 655 (1857); *People v Stewart,* 5 Mich 243 (1858).

[8] The Court notes that prosecutions for the forgery, etc., of the currency of other nations, for example, that of our Canadian neighbors, may also properly be brought under these sections of our law.

We next consider whether appellant's argument has any merit with reference to the provisions of §§ 250 and 253, proscribing different penalties for forgery and uttering and publishing of instruments issued by the state and other governmental bodies.

As we noted before, cashier's checks, bank drafts, promissory notes from a bank and all other items of modern day commerce are included within the confines of §§ 248 and 249. We note that historically it was under these sections that such items were properly prosecuted. *People v Brigham, supra.*

Section 250 prescribes penalties for forgery of any note, certificate, bond, warrant or other instrument issued by this state or any of its political subdivisions or municipalities. Section 253 prescribes uttering and publishing of instruments so issued. Thus this Court is faced with the question of whether or not there is any rational distinction between these types of instruments and those proscribed by §§ 248 and 249 sufficient to justify the marked difference in punishments provided for violations of the different sections.

In answering this question we must first interpret exactly what types of commercial paper are proscribed by § 250.

The statute reads:

"Any person who shall falsely make, alter, forge, or counterfeit any note, certificate, bond, warrant or other instrument * * * ."

An interpretation of the phrase "or other instrument" is essential. We find that the rule of *ejusdem generis* as set forth by this Court in *People v Powell,* 280 Mich 699; 274 NW 372; 111 ALR 721

(1937), citing *McDade v People, supra,* requires us to confine the phrase "or other instrument" to include only those instruments of the same general character, sort, or kind, as those specifically referred to in the statute.

In *Powell, supra* 704, we stated:

"Where no intention to the contrary appears, general words used after specific terms are to be confined to things *ejusdem generis* with the things previously specified."

Therefore, only instruments similar to state and local notes, certificates, bonds and warrants fall within the confines of § 250 *et seq.*

Having established the type of items proscribed by § 250 *et seq.,* it becomes apparent to the Court that there is one crucial difference between these items and the general items proscribed by §§ 248 and 249. The state and local bonds, notes and warrants all have one thing in common that a personal or corporate check or draft does not. The extent and the range of freedom of movement and circulation in the community is severely limited with respect to state obligations, as opposed to the free negotiability and wide circulation in the community of their private commercial counterparts.

The average citizen is most likely to encounter in his everyday commercial dealings the state or local warrant. Such state warrants are issued by the State Treasurer and drawn on the state treasury. They are issued to all state employees as their "paychecks" and are issued to welfare recipients, vendors furnishing material to the state, and are used by the state to pay its ordinary day-to-day bills. However, when these statutes were adopted, the law in this state was in accord with the proposition that a warrant was not a negotiable

instrument.[9] *Fox v Shipman*, 19 Mich 218 (1869); *Burns v Bender*, 36 Mich 195 (1877). We feel that the difference between a negotiable, as opposed to a non-negotiable instrument is not one to be ignored by the Court in its consideration of the question presented.

Likewise, state and local bonds, tax-anticipation notes and other notes and certificates issued by the state and its political subdivisions and municipalities all are highly limited in their ease of negotiability and circulate generally among small, confined groups of experienced investors, purchasers and banks. Almost all bond issues are put upon the market bearing face denominations in the amount of at least $1,000. A high percentage of these bond issues have a face value of $5,000 and some are even in excess of that figure. Furthermore, our statutes require that all such bonds be registered with the state. Needless to say, only a small percentage of the general community purchase such items.

The state and local notes are generally in the form of tax-anticipation notes. With those issued by the state they nowadays are in amounts totaling millions of dollars. On the local level they are still for considerable sums and most generally are purchased by banks and other institutional investors. Their circulation is also generally confined to extremely small segments of our community.

The average citizen and commercial establishment deals almost daily with the negotiable items proscribed by §§ 248 and 249. Yet this Court would not find it unbelievable or beyond the stretch of the imagination to be informed that the average

_____

[9] This Court need not decide at this time what effect, if any, MCLA 440.3104; MSA 19.3104 has upon our prior decisions regarding the negotiability of a state warrant.

citizen and our general commercial stores, markets, etc., have never even seen, much less have dealt with and personally transferred and negotiated those state and local instruments set forth above.

As previously stated in this opinion, penal statutes are to be construed in light of the evil to be cured. In the case of our forgery and uttering and publishing statutes, this evil consists of hinderances and impediments to the free transferability and negotiability of commercial paper and other written instruments upon which society has come to rely in the operation of its everyday affairs. If those affairs are more likely to be disrupted by the forgery and uttering and publishing of personal and private checks, drafts, etc., than they are by forged and false state bonds, notes, etc., then it would appear rational for the Legislature to prescribe a higher penalty for those items in the former category.

There is little doubt of one thing. If a large number of forged personal, corporate and commercial checks suddenly appeared within the stream of commerce, they by their sheer volume and their far-reaching effect on the everyday affairs of all our private citizens, would pose a far greater danger to society as a whole than forgery of state bonds or notes. Because of the tight control and limited number of persons involved, the latter situation would have little, if any, immediate effect on our average citizen. We cannot say that it is irrational for the Legislature to punish that offense less likely to have a severe impact on our society more lightly, and prescribe a higher penalty for that offense more likely to cause the greater harm.

We therefore find that our Michigan uttering

and publishing scheme, limited and defined as per this opinion, does not violate equal protection of the laws as guaranteed by our Federal and state Constitutions.

For the reasons set forth in Part I of this opinion, the Court of Appeals is reversed and the case is remanded back to the trial court for a new trial.

T. G. KAVANAGH, SWAINSON, WILLIAMS, LEVIN, and M. S. COLEMAN, JJ., concurred with T. M. KAVANAGH, C. J.

J. W. FITZGERALD, J., did not sit in this case.