## PEOPLE v ARTHUR BURTON

1. CRIMINAL LAW—CROSS-EXAMINATION—BELIEF IN GOD.

   Questioning a defendant on cross-examination regarding his belief in God is reversible error, even absent an objection.

2. CRIMINAL LAW—APPEAL AND ERROR—WALKER HEARING—ENTIRE RECORD—CLEAR ERROR.

   The Court of Appeals reviews the entire record to determine whether the judge's ruling at a *Walker* hearing was correct; however, the lower court's ruling will not be upset unless it is clearly erroneous.

3. CRIMINAL LAW—MIRANDA WARNINGS—CONFESSION—ADMISSIBILITY.

   Confession of a prisoner to a crime other than that for which he was imprisoned was admissible, although the prisoner had not been given *Miranda* warnings, where (1) the bulk of the prisoner's statement was volunteered without questioning, (2) police questions were more akin to preliminary exploration than interrogation designed to elicit an admission of guilt, and (3) the police investigation never reached the accusatory stage or focused on the prisoner.

4. CRIMINAL LAW—CONFESSIONS—VOLUNTARINESS.

   The circumstances in which a promise was made by police to a defendant that his girlfriend could claim reward money if defendant confessed to a crime were compatible with the exercise by defendant of a free volition where (1) the promise was solicited by the defendant, (2) defendant knew the difference between claiming a reward and receiving it, and (3) the police kept their promise to permit defendant to telephone his girlfriend about the reward.

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 809.
[2] 5 Am Jur 2d, Appeal and Error § 545 *et seq.*
[3] 29 Am Jur 2d, Evidence §§ 536, 538, 544, 547.
   Admissibility of pretrial confession in criminal case—Supreme Court cases. 12 L Ed 2d 1340.
[4] 29 Am Jur 2d, Evidence §§ 558–565.

Appeal from Wayne, John D. O'Hair, J. Submitted October 14, 1976, at Detroit. (Docket No. 23610.) Decided March 3, 1977.

Arthur J. Burton was convicted of first-degree murder. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Criminal Division, and *Don W. Atkins,* Assistant Prosecuting Attorney, for the people.

*Joel M. Shere,* for defendant.

Before: D. E. Holbrook, Jr., P. J., and N. J. Kaufman and D. C. Riley, JJ.

Per Curiam. Defendant appeals his jury-based conviction on a charge of first-degree murder, MCLA 750.316; MSA 28.548, for which he received a sentence of life imprisonment. In urging reversal, he directs our attention to three aspects of the proceedings below.

I.

Initially, defendant asserts that the following excerpt from the cross-examination of defendant at trial discloses prosecutorial error in violation of MCLA 600.1436; MSA 27A.1436, and *People v Hall,* 391 Mich 175; 215 NW2d 166 (1974):

"Q *[Mr. Easton, Assistant Prosecuting Attorney]:* Didn't you tell the doctor this towards the end of the Brevitol statement: 'The guy didn't want to give me any money I wanted so I just shot him'?

"A *[defendant]*: I guess I did say it if it's in the statement.

"Q Then you did carry out a plan. You didn't get what you wanted and you knew you had a gun with you and you just shot him, is that right?

"A No.

"Q It's in the statement.

"A So. There's a lot of lies in the statement.

"Q Now, your *(sic)* saying that that might be a lie too?

"A I'm not saying it might be; I'm saying it is.

"Q When do we know that your *[sic]* telling the truth and when your *[sic]* lying? We just have to take your * * * . Do you believe in God?

"THE COURT: Just a minute please, strike that question. Disregard that question, members of the jury. Are you aware that you are under oath?

"THE WITNESS *[defendant]*: Yes."

In *Hall, supra,* the Supreme Court held that asking a defendant whether he believes in a supreme being constitutes reversible error even absent objection:

"If we were, on a case by case basis, to evaluate the entire record to determine if prejudice or manifest injustice occurred therein because of this type of question, we would emasculate our statute and the legislative intent behind it. Our statute clearly states that an accused is entitled to be tried and convicted without the question of his religious opinions ever being put in front of the judge or jury for their consideration. *Whether the defendant hesitates, or unhesitatingly responds negatively or positively, or if he should quite properly refuse to respond, he still cannot avoid the risk of stimulating an offensively prejudicial reaction in some quarter of the jury.* This Court feels that it is inappropriate for it to take it upon itself to determine whether or not such prejudicial reaction did in fact occur, when our statute clearly attempts to foreclose such review by forbidding the asking of the prejudicial question itself.

A defendant is entitled to a trial free of such improper questions. Once the question is asked, this is no longer possible. A new trial is mandated." 391 Mich at 182–183. (Emphasis added.)

In contrast to *Hall,* the swift action of the judge below differentiates the present case from the facts in *Hall* and from the various hypothesized responses the Supreme Court believed a defendant might display when asked about a belief in God. Here the trial judge intervened immediately, ordered the question stricken, directed the jury to disregard it and inquired whether the defendant realized he was still under oath. Hence, the defendant had no time to mull over the prosecutor's question, to answer it or to refuse to respond. By asking defendant whether he was aware that his testimony was still under oath, the judge on one hand impressed on defendant the sense of his obligation to be truthful and on the other diverted the jury's focus from an improper to a proper line of inquiry. We believe, therefore, that the judge's *sua sponte* response effectively dissipated "the risk of stimulating an offensively prejudicial reaction in some quarter of the jury". *Id.*

In addition to these factual distinctions, other considerations militate against a strict application of *Hall.* For one, *Hall* was decided on February 27, 1974, whereas the present case came to trial on January 8, 1975. Thus, there was ample time for the *Hall* rule to come to the attention of diligent counsel who could, if so disposed, move for a mistrial.[1] For another, we are troubled by the practical result of *Hall* which gives defendants two bites at the apple. They can wait to see if the jury renders an innocent verdict; and if it does not,

[1] It is unclear from the facts in *Hall* whether defendant sought a mistrial. In the case at bar, however, no mistrial was requested.

they can demand retrial under *Hall.* Finally, we note that not all questions concerning a belief in God mandate reversal. Rather, the facts must be examined in context. See *People v Jenness,* 5 Mich 305 (1858), *People v Booth,* 58 Mich App 466; 228 NW2d 425 (1975), and *People v Bouchee,* 62 Mich App 132; 233 NW2d 503 (1975).

Regarding this final point, *People v Jenness, supra,* cited approvingly in *Hall,* is particularly instructive. *Jenness* was an incest prosecution in which the witness, defendant's niece and alleged paramour, was examined by defense counsel on voir dire regarding her religious beliefs. She testified that she held an unflinching devotion to a supreme being. On later cross-examination counsel for defendant attempted to impeach the witness by asking whether she had ever disavowed her belief in a deity. An objection was taken by the prosecution and sustained by the court. However, the decision does not reveal whether the witness answered the question or whether a curative instruction issued from the bench. At any rate, the trial proceeded to its resolution and defendant was found guilty.

Nowhere in *Jenness,* however, is it suggested that having heard an improper question the jury thereby was deprived of its powers of reason, overtaken by feelings of prejudice toward the witness and, hence, unable to accord her testimony fair weight. An objection to the question by the prosecution apparently sufficed to correct the error.

Accordingly, we see no reason why in the present case an objection initiated by the judge, followed promptly by a cautionary instruction, should be any less effective a remedy.

Having said all of this, we nonetheless reluc-

tantly reverse, compelled as we are by the clear, albeit gratuitous, dicta in *Hall*. However, we urge the Supreme Court to reconsider whether it believes *Hall* should properly apply to facts such as these. If ever a judge acted speedily to correct any possible error that may have arisen, this judge did. While we appreciate the cherished value that *Hall* upholds, we would not by a wooden application of *Hall* bestow a windfall on the defendant because of an unanswered question that slipped past the lips of a seemingly exasperated prosecutor in the middle of a month long trial. Especially is this so where the trial court did everything within its power, short of declaring a mistrial, to cabin the error before it could spread.

## II.

In light of our disposition of this case we need not respond to defendant's second assignment of error since it is unlikely to recur on retrial. Such is not the case, however, regarding defendant's arguments on the admissibility of various confessions.

On June 3, 1974, in a basement hallway of Recorder's Court, defendant, while under arrest for an unrelated crime and in the custody of two sergeants, grabbed at one of the officers' guns and a struggle ensued. Officer Harold Upshaw, hearing the scuffle, rushed from the adjacent lunch room into the hallway and handcuffed defendant, but not before defendant had been dealt two blows over the head with a flashlight by one of the other policemen.

After having defendant photographed, Officer Upshaw placed defendant in an empty waiting cell, removed the manacles, and instructed defendant to wash his hands and face in the sink at the

opposite end of the cell. Officer Upshaw also told defendant to bring back a wet paper towel to the cell door and defendant did so. The officer took the towel and leaning through the cell window cleaned away some blood from the back of defendant's head. The two then began a conversation on a number of inconsequential topics. During their talk defendant took the paper towel, wadded it into a ball and began shooting baskets at the sink at the far end of the cell. While the men talked, defendant would repeatedly retrieve the wad and shoot more baskets at the sink.

After a few minutes, defendant asked Officer Upshaw if he wanted to make some money, and the officer asked how. Defendant said that there was money on his head, about $7,000, and that he shot someone in Dearborn.

Officer Upshaw sought the victim's name, but defendant would not reveal it unless Officer Upshaw agreed to help defendant's girlfriend share in the reward. The officer consented. Before divulging the name, however, defendant asked Officer Upshaw how a police officer could claim a reward; the policeman's response was that a Detroit officer could claim the reward for a crime committed in Dearborn, so there was no problem. At last, defendant told Officer Upshaw the name of the person he shot. The officer did not ask how the shooting took place and defendant offered no additional details. At no time were *Miranda*[2] warnings given, however.

After learning the shooting victim's name, Officer Upshaw contacted the Dearborn Police who sent two detectives to interview defendant that same day. Defendant was advised of his *Miranda*

[2] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

rights and he signed a waiver form. Again defendant raised the question of the reward and the detectives agreed to look into it. Defendant then acknowledged that he was present at the shooting and gave additional details short of implicating himself.

Two days later the detectives, accompanied by a Wayne County Prosecutor and a stenographer, met again with defendant. *Miranda* warnings were given and duly waived in writing. As before, defendant initiated talk of the reward; he agreed to confess fully if his girlfriend would be permitted to claim the reward. Defendant was permitted to call his girlfriend and was provided with the phone number of the organization offering the reward. After the call, he expressed a willingness to talk, stated that he was about to tell the truth and then outlined the details of the grisly murder in which he admitted shooting the victim five or six times in the face.

Defendant raises two appellate arguments concerning the admissibility of the confessions. First, he argues that the initial revelation to Officer Upshaw made without benefit of *Miranda* warnings should have been suppressed along with its poisonous fruit, namely, the two later confessions. Second, he contends that the confessions were involuntary because they were induced by promises of reward money for defendant's girlfriend.

Prior to trial the lower court held an extensive *Walker*[3] hearing and concluded that the statements were voluntary and thus admissible. The judge ruled that since the inculpatory statements to Officer Upshaw had been volunteered, no *Miranda* warnings were necessary. Regarding the

---

[3] *People v Walker (On Rehearing),* 374 Mich 331; 132 NW2d 87 (1965).

alleged promises, the judge questioned the defendant about his familiarity with the reward program. The defendant indicated that he was well aware of it, had followed closely every account of it in the papers and appreciated the difference between making a claim for the reward and actually receiving it. Defendant readily agreed that to receive the reward, a conviction is required. The judge found that the promises involved only assisting defendant's female friend in making a claim for the reward and that the officers had fulfilled their promises.

While this Court reviews the entire record to determine whether the judge's ruling at the *Walker* hearing was correct, *People v Kyllonen,* 66 Mich App 467; 239 NW2d 410 (1976), we do not upset the lower court's ruling unless it is "clearly erroneous". *People v Kelly,* 30 Mich App 154; 186 NW2d 72 (1971), *People v Szczytko,* 40 Mich App 161; 198 NW2d 740 (1972), *affirmed* 390 Mich 278; 212 NW2d 211 (1973).

At the *Walker* hearing, Officer Upshaw testified that during his 6-1/2 years with the police department he had often been approached by prisoners with offers of money; that he had no reason to believe or disbelieve defendant's story; that at the time he agreed to aid defendant's girlfriend in obtaining the reward, he did not take defendant seriously; and that he had no recollection of this particular shooting until after defendant revealed the name of the victim.

Taking into account the "totality of the circumstances", *People v Reed,* 393 Mich 342, 357; 224 NW2d 867 (1975), *cert den* 422 US 1044; 95 S Ct 2660; 45 L Ed 2d 696 (1975), we hold that Officer Upshaw was not obliged to give *Miranda* warnings to defendant.

The bulk of defendant's statements, save the identity of the shooting victim, was purely voluntary and thus beyond the purview of *Miranda*, *People v Moore*, 51 Mich App 48; 214 NW2d 548 (1974), *People v Griner*, 30 Mich App 612; 186 NW2d 800 (1971), *People v McKee*, 28 Mich App 610; 184 NW2d 750 (1970).

With regard to the officer's question concerning the identity of the victim and his comment about the reward, we stress the context in which they arose: while shooting baskets with a wadded paper towel at the sink in the far end of the cell, defendant casually initiated a conversation about an offer of money, about shooting someone in Dearborn and about a posted reward; Officer Upshaw, having heard many such offers from prisoners in the past and having no particular reason to believe defendant's story, went along with defendant by probing a bit further. Since Officer Upshaw was a Detroit policeman, it is altogether plausible that information regarding a shooting in Dearborn would not strike a responsive chord in him and that he might not take defendant seriously. When viewed in perspective, the questions seem more akin to "preliminary exploration", *Reed, supra* at 360, than to interrogation designed to elicit an admission of guilt. The officer had no way of knowing whether a crime had actually occurred or whether the defendant had concocted the story just to toy with the officer. Once defendant named the person he shot, Officer Upshaw did not press defendant for more details of the incident. Hence, this brief custodial investigation, prompted by defendant's volunteered statements, never reached the accusatory stage and never focused on defendant. *Reed, supra* at 357, *People v Ridley*, 396 Mich 603; 242 NW2d 402 (1976). No *Miranda* warnings were required.

Neither are we persuaded that defendant's confessions were tainted by alleged promises that defendant's girlfriend would receive the reward. Defendant fully appreciated the distinction between claiming the reward and receiving it. Thus, defendant's confession could not have been motivated by promises which he well knew could only be fulfilled upon his conviction. In any event, the record below clearly indicates that the officers permitted defendant to telephone his friend about the reward and the manner of claiming it. That was the extent of their promises.

We believe that "the circumstances of the promise[s] in the instant case were entirely compatible with the exercise by the [defendant] * * * of a free volition in the giving of the confessions, and therefore the confessions were admissible. * * * Here the promise[s were] * * * *solicited* by the accused, freely and voluntarily, so [he] * * * cannot be heard to say that in accepting the promise[s he was] * * * the *victim* * * * of compelling influences". *Taylor v Commonwealth,* 461 SW2d 920, 922 (Ky, 1970). (Emphasis in original.)

Finding no clear error in the lower court's ruling on admissibility, we hold that the three confessions may be entered as evidence on retrial.

Reversed and remanded.