PEOPLE v GILBERT

Docket No. 64147. Argued December 10, 1980 (Calendar No. 6).—
Decided September 28, 1982.

Daniel C. Gilbert was charged with equipping a motor vehicle
with a radio receiving set capable of receiving signals on
frequencies assigned for police purposes, namely, a radar detec-
tor. The Troy Municipal Court, William E. Bolle, J., granted
the defendant's motion to dismiss on the ground that the
statute under which he was charged does not apply to radar
detectors. The Oakland Circuit Court, Robert L. Templin, J.,
reversed and remanded the case for trial. The Court of Appeals,
Danhof, C.J., and Bashara and Cynar, JJ., held that the statute
applied to radar detectors, but ordered dismissal of the charge
against the defendant on the ground that the statute was
insufficient to put him on notice of its application to radar
detectors (Docket No. 78-383). The defendant appeals.

In an opinion by Justice Levin, joined by Chief Justice
Coleman and Justices Kavanagh, Fitzgerald, Ryan, and Moody,
the Supreme Court *held:*

A radar detector is not a radio receiving set within the
meaning of the statute.

1. At the time that the Legislature enacted the section of the
Penal Code which prohibits the equipping of a motor vehicle
with a radio receiving set capable of receiving signals on
frequencies assigned for police purposes, the term "radio receiv-
ing set" referred to devices which are today called radios. The
fact that the term "radio receiving set" may now be applied to
television sets and radar detectors does not provide grounds for
enlarging the meaning of the term as it was used at the time
the statute was enacted. At that time, neither television nor

REFERENCES FOR POINTS IN HEADNOTES
[1-8, 10] 74 Am Jur 2d, Telecommunications § 209.
[4] 73 Am Jur 2d, Statutes §§ 145, 146.
[7, 8] 74 Am Jur 2d, Telecommunications § 23.
[8] 16 Am Jur 2d, Conflict of Laws § 15.
[9, 10] 16A Am Jur 2d, Constitutional Law §§ 750, 751.
[9] 29 Am Jur 2d, Evidence § 12.

radar had been developed, and the Legislature could not have realized that radar would eventually be used as a means for detecting speeding motorists or have assessed the defensive measures motorists would employ to avoid surveillance.

2. The Legislature, through the enactment of the statute, sought to deter robbers and burglars from eavesdropping on confidential two-way radio communications by the police. The behavior proscribed was the breach of confidential police radio communications after a crime had been detected. The statute was not meant to protect attempts by the police to detect crimes by means of a technology which had yet to be developed. Technological innovation may not be an obstacle to the application of a statute where the new technology facilitates the achievement of ends which the Legislature clearly means to encourage or discourage. But in this case the new technology is responsible for generating issues of public policy which the Legislature could not have foreseen. Radar detectors do not monitor communications between police officers; rather, they alert the user to electronic surveillance of his vehicle by the police. The policy considerations which support the proscription of vehicular monitoring of confidential police communications do not necessarily extend to the monitoring of electronic surveillance by the police.

3. The rationale for outlawing radar detectors is not that the detectors themselves are dangerous, but that their use will enable motorists to escape apprehension for driving in excess of the lawful speed limit. The prohibition fits within the broad category of crimes known as "possession offenses", which are generally thought to merit lesser punishment than the crimes they foreshadow. Under the Michigan Vehicle Code, violation of a prescribed speed limit is a civil infraction and the penalty is a fine; yet the equipping of a vehicle with a radio receiving set is a high misdemeanor, providing for a penalty of a fine or incarceration or both. While the penalty provisions make sense where the targets are robbers and burglars, that cannot be said where the statute is employed to punish motorists who violate the traffic laws. It is improbable that the Legislature would adopt such a penalty scheme for a traffic-related offense. A legislative purpose to do so is not unmistakable and should not be attributed to the Legislature.

4. Although in the light of the decision of the Court of Appeals with respect to defendant Gilbert the case is arguably moot, it is of sufficient importance to warrant decision by the Supreme Court. Few persons charged as was the defendant have the resources to litigate the question to the Supreme

Court. The question affects a considerable number of people, and law enforcement agencies and the lower courts need a final, definitive ruling. Furthermore, construction of the statute will serve to alert the Legislature to the subject matter.

Affirmed insofar as the charge against Gilbert is dismissed.

Justice Williams, dissenting, would hold that equipping or using a vehicle with a radar detector is prohibited by the challenged statute, and that the statute is valid.

1. A radar detector falls within the definition of a radio receiving set that will receive signals, and the frequencies which it receives have been assigned for police purposes. The term "radio receiving set" is not limited by the statute to a device which receives voice communications. The statute only requires that the prohibited device receive radio signals. Therefore, the term "radio receiving set" encompasses the term "radar detector" within the plain meaning of the statute. The statute does not require that the frequencies received be *exclusively* assigned for police purposes, only that they be assigned.

2. The enforcement of the statute is a valid exercise of the state's police power to regulate highway safety which does not directly conflict with and is not pre-empted by the Communications Act of 1934.

3. The statute does not affect a fundamental interest or impose a suspect classification. The designation of persons who may monitor the assigned frequencies in vehicles involves classifications which are rationally related to the statute's objective, consistent with equal protection guarantees.

4. The means chosen by the Legislature to achieve the promotion of health, welfare, and safety, *i.e.*, the prohibition against equipping or using a vehicle with a radio receiver such as a radar detector, are rationally related to the statute's objective and do not amount to a denial of due process.

5. Despite its logical clarity, a reasonable layperson might not have understood until now that radar is within the proscription of the statute. Therefore, because of the practical possibility that the defendant might not have been put on notice that the use of the radar detector was forbidden by the statute, the decision of the Court of Appeals dismissing the charges against the defendant should be affirmed. However, because of the "judicial gloss" placed on the statute, persons who, in the future, equip or use a vehicle with a radar detector should be on notice that such conduct is unlawful.

88 Mich App 764; 279 NW2d 546 (1979) affirmed insofar as the charge against the defendant is dismissed.

OPINION OF THE COURT

1. CRIMINAL LAW — AUTOMOBILES — RADIO RECEIVERS — RADAR
    DETECTORS.

    A radar detector is not a radio receiving set for purposes of the
    section of the Penal Code which prohibits equipping a motor
    vehicle with a radio receiving set capable of receiving signals
    on frequencies assigned for police purposes (MCL 750.508; MSA
    28.776).

2. CRIMINAL LAW — AUTOMOBILES — RADIO RECEIVERS — RADAR
    DETECTORS.

    The section of the Penal Code which proscribes equipping a motor
    vehicle with a radio receiving set capable of receiving signals
    on frequencies assigned for police purposes was intended to
    apply to radio receivers capable of receiving confidential voice
    communications between police officers and not to television or
    radar detectors, which had not been developed at the time of
    enactment (MCL 750.508; MSA 28.776).

3. CRIMINAL LAW — AUTOMOBILES — RADIO RECEIVERS — ELECTRONIC
    SURVEILLANCE — RADAR DETECTORS.

    The section of the Penal Code which proscribes equipping a motor
    vehicle with a radio receiving set capable of receiving signals
    on frequencies assigned for police purposes was intended to
    outlaw the breach of confidential radio communications by the
    police by robbers and burglars; it was not intended to immunize
    attempts by the police to detect crimes by means of a radio
    technology yet to be developed, nor was it intended to be
    extended to the monitoring of electronic surveillance by the
    police through the use of radar detectors (MCL 750.508; MSA
    28.776).

4. CRIMINAL LAW — AUTOMOBILES — RADIO RECEIVERS — RADAR
    DETECTORS — PENALTIES.

    The penalties prescribed for equipping a motor vehicle with a
    radio receiving set capable of receiving signals on frequencies
    assigned for police purposes are proportionate to the gravity of
    the offense where the statute is construed to proscribe the
    monitoring of confidential voice communications between police
    officers by robbers and burglars, but the penalties are dispro-
    portionate when applied to the monitoring with radar detectors
    of electronic surveillance of motorists by the police; the result
    of applying the statute to the use of radar detectors is so
    improbable as to preclude an inference that the Legislature

intended such an application without unmistakable evidence of legislative intent (MCL 750.508; MSA 28.776).

DISSENTING OPINION BY WILLIAMS, J.

5. CRIMINAL LAW — AUTOMOBILES — RADIO RECEIVERS — RADAR DETECTORS.

*A radar detector is a radio receiving set within the purview of the statute which prohibits equipping or using a vehicle with a radio receiving set capable of receiving frequencies assigned for police purposes; therefore, a person who equips a vehicle with a radar detector or who uses such a vehicle, and who does not fall within the statutory exemptions, may be prosecuted under that statute (MCL 750.508; MSA 28.776).*

6. CRIMINAL LAW — AUTOMOBILES — RADIO RECEIVERS.

*The statute which prohibits equipping or using a vehicle with a radio receiving set capable of receiving frequencies assigned for police purposes does not require that the frequencies involved be assigned exclusively for police use in order for their reception to be restricted (MCL 750.508; MSA 28.776).*

7. CRIMINAL LAW — AUTOMOBILES — RADIO RECEIVERS — POLICE POWER.

*The statute which prohibits equipping or using a vehicle with a radio receiving set capable of receiving frequencies assigned for police purposes is a valid exercise of the state's police power and is not pre-empted by the Communications Act of 1934 (47 USC 151 et seq.; MCL 750.508; MSA 28.776).*

8. CONSTITUTIONAL LAW — FEDERAL PRE-EMPTION — STATE INTEREST.

*A court, in determining whether an exercise of state police power is pre-empted by an act of Congress, should consider, in light of the presumption against pre-emption where a strong state interest is involved, the pervasiveness of the federal scheme, the need for federal occupation of the field dictated by national uniformity, and the danger of conflict between state law, and the administration of a federal program.*

9. CONSTITUTIONAL LAW — EQUAL PROTECTION — STRICT SCRUTINY — RATIONAL BASIS.

*A court, in reviewing legislation which affects a fundamental interest or involves a suspect classification, must apply the strict scrutiny test, requiring the state to justify the legislation by showing a compelling state interest; where the classification is not suspect and does not involve a fundamental interest, the burden is on the party challenging the legislation to show that*

*the classification is essentially arbitrary and does not bear a rational relationship to the object of the legislation (US Const, Am XIV; Const 1963, art 1, § 2).*

10. CRIMINAL LAW — AUTOMOBILES — RADIO RECEIVERS — EQUAL PROTECTION.

*The statute which prohibits equipping or using a vehicle with a radio receiving set capable of receiving frequencies assigned for police purposes was enacted to facilitate law enforcement activity; the statute's restriction of persons permitted to monitor those frequencies involves classifications which are rationally related to the statute's objective, consistent with equal protection and due process guarantees (US Const, Am XIV; Const 1963, art 1, §§ 2, 17; MCL 750.508; MSA 28.776).*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, L. *Brooks Patterson,* Prosecuting Attorney, *Robert C. Williams,* Chief Appellate Counsel, and *Michael J. Modelski,* Assistant Prosecuting Attorney, for the people.

*Bacalis & Associates, P.C.* (by *Jesse R. Bacalis* and *John D. Honeyman; Fletcher, Heald & Hildreth,* by *Robert L. Pettit,* of counsel), for the defendant.

Amicus Curiae:

*Kantner & Smith* (by *Martin Smith)* for Electrolert, Inc.

LEVIN, J. Daniel C. Gilbert is charged, on evidence that there was a radar detector in a motor vehicle he was driving,[1] with equipping a motor vehicle with a radio receiving set that will receive

---

[1] The Court of Appeals declared that defendant's automobile was "equipped with a radar detector". *People v Gilbert,* 88 Mich App 764, 766; 279 NW2d 546 (1979). The prosecutor states that "[t]he issue of whether a defendant had equipped his vehicle with a police radar detector, or used the same, would be a question of fact". There has been no trial in this case.

signals on frequencies assigned for police pur-
poses.[2]

The municipal judge granted Gilbert's motion to
dismiss on the ground that the statute does not
apply to radar detectors. The circuit judge re-
versed and remanded for trial. The Court of Ap-
peals also rejected Gilbert's challenges but ruled
that its decision would be prospective only and,
reversing the circuit court, directed that the
charges be dismissed.

The principal issue is whether a radar detector
is a "radio receiving set" within the meaning of
the statute.[3] We hold that it is not because the
statute protects the confidentiality of police *com-
munications* but not electronic *surveillance* by the
police.

The question whether persons should be barred
from installing devices designed to detect elec-
tronic surveillance by the police was not addressed
by the Legislature when this statute was enacted
in 1929.

The asserted desirability of barring motorists
from installing radar detectors does not justify a
court in placing a construction on the statute
which the Legislature could not possibly have
contemplated in 1929 when the statute was en-
acted.

---

[2] "Sec. 508. Any person who shall equip a vehicle with a radio
receiving set that will receive signals sent on frequencies assigned by
the federal communications commission of the United States of
America for police purposes, or use the same in this state unless such
vehicle is used or owned by a peace officer or a bona fide amateur
radio operator holding a conditional, general, advanced or extra class
amateur license issued by the federal communications commission,
without first securing a permit so to do from the commissioner of the
Michigan state police upon such application as he may prescribe,
shall be guilty of a misdemeanor, punishable by imprisonment in the
county jail not more than 1 year or by a fine of not more than
$500.00 or by both such fine and imprisonment in the discretion of
the court." MCL 750.508; MSA 28.776.

[3] Our disposition makes it unnecessary to consider the other issues
and we intimate no opinion thereon.

The reading of the statute set forth in the opinion of the Court of Appeals and in the dissenting opinion in this Court would bar the equipping of a motor vehicle with a device designed to detect electronic surveillance of speech within the vehicle as well as of a device to detect electronic surveillance of the speed of the vehicle.

The statute subjects offenders to a conviction record of having committed a high misdemeanor and to incarceration for up to one year. If the Legislature were to proscribe radar detectors, it is likely that the penalties for installation or use of a radar detector would be more commensurate with the penalties for speeding.

It is for the Legislature to decide whether, and the extent to which, the detection of police electronic surveillance should be barred. There may be some concern that the Legislature may not act quickly or at all, but that surely is not a proper basis for this Court acting in the name of the Legislature.

I

It appears, as set forth in the dissenting opinion, that radio waves carry signals that can today be perceived visually or audibly. The term "radio receiving set", thus, may *now* be construed to include a television set or a radar detector. But at the time the statute was enacted, in 1929, neither television sets nor radar detectors had been developed. At the time, the only radio receiving set in use was what is today called a radio.

A

The members of the Legislature had in mind a

particular device, the radio, and not television sets or radar detectors which had not been developed in 1929. The advance in the art, 10 to 15 years after the statute was enacted, does not enlarge the meaning of the term "radio receiving set" from the only meaning known to those who used that term when the statute was enacted.

The dissenting opinion concludes that a "narrow" construction of the statute "encompasses the term radar detector within the *plain meaning* of the statute."[4] (Emphasis added.) This conclusion rests on post-enactment usage: "radar is a convenient acronym for 'RAdio Detection And Ranging' "[5] and "*Webster's Third New International Dictionary, Unabridged (1966) Edition,* p 1871, has defined 'radar' as 'a radio device or system for locating an object by means of emitting radio signals' ". (Emphasis supplied.)

Words do not stand outside their history. They draw their meaning from it. The plain-meaning rule of statutory construction assumes that the words of a statute have the same meaning to those who authored it and to those who read it. This assumption might be accurate if linguistic usage remained static. But usage and meanings may change considerably over time, and the semantic identity between author and reader which the plain-meaning rule presupposes may be severed. A succeeding generation of readers may read meanings into a text which were never intended. Words chosen to deal with a specific problem may, as a result, be given meanings that could extend their

[4] *People v Gilbert, infra,* p 217.

[5] *People v Gilbert, infra,* p 217.

field of application well beyond anything the author could have envisioned.[6]

A court's responsibility when it construes a statute is to implement the purpose and intent of those who enact it.[7] A failure to consider whether the Legislature understood the meaning of a term quite differently when a statute was enacted than it is understood today would allow a statute to be construed in a manner which extends its intended scope. The proper inquiry is not whether the term "radio receiving set" would be understood by a modern reader to include the use of radar but whether at the time the phrase was used the Legislature provided for this technological development.

B

Radar had yet to be developed when the Legislature enacted this statute in 1929. During the 1930's, under the veil of military secrecy, scientists were still seeking to develop a method for producing radio signals with short wavelength characteristics so that the speed and position of an object travelling through space could be monitored. Although the term "radar" was not coined until 1942, by 1936 the United States military had successfully developed a radar system for target tracking and navigation. It was only after the Second World War that highway police began to use a simple radar transmitter for the detection of speeding vehicles, the shifting reflections from moving vehicles enabling instant and direct mea-

---

[6] See *Guiseppi v Walling*, 144 F2d 608, 624 (CA 2, 1944); Jones, *The Plain Meaning Rule and Extrinsic Aids in the Interpretation of Federal Statutes*, 25 Wash L Q 2 (1939); Murphy, *Old Maxims Never Die: The "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts*, 75 Colum L Rev 1299 (1975).

[7] *White v City of Ann Arbor*, 406 Mich 554; 281 NW2d 283 (1979).

surement of their velocity. Thus, at the time this statute was enacted, the Legislature was not in a position to realize that radar would come to be used as a means for detecting speeding motorists, much less to assess the defensive measures motorists would take to avoid surveillance.

The dissenting opinion asserts that it is but an "insignificant difference"[8] that radar, in contrast with conventional radio, does not transform received signals into voice communications. While this difference may seem unimportant today, it helps to identify the actual problem which the Legislature meant to address when it enacted this statute.

Through the enactment of this statute, the Legislature sought to deter criminals from eavesdropping on two-way police communications. It was feared that if criminals were able to pick up police dispatches to the scene of a crime, their escape would be facilitated. The concern which gave rise to statutes designed to assure the confidentiality of two-way police transmissions has been described by a person conversant with the subject of police communications systems in the following manner:

"Secrecy is fundamental to the success of both military and police operations. Premature publication of details connected with criminal investigation has thwarted the police on occasions without number. When radio was adopted as an arm of police communication, secrecy received much serious consideration, since, in radio transmission, information is radiated to all points of the compass. Any person possessing a suitable receiver might listen to police broadcasts. The probability that criminals would exploit this opportunity to their advantage was obvious.

---

[8] *People v Gilbert, infra,* p 217.

"In the early use of radio in law enforcement, many police officials viewed the problem with anxiety. At the 1924 convention of the International Association of Chiefs of Police, a committee was appointed to prepare a suitable code for police use, in order that information might be transmitted without the possibility of its being intercepted and used for criminal purposes.

"The story has been frequently told of an apartment-house burglar in Chicago who had taken the precaution to tune the receiver in the apartment to the police broadcast frequency. Neighbors reported to the police their suspicions of a burglary and the radio dispatcher immediately went on the air with an alarm broadcast, 'Burglar operating in apartment on sixth floor at 5346 Main Street,' and ordered squad cars to the scene. Hearing the message, the burglar is said to have written a note of thanks for the warning, pinned it on the radio and made a leisurely departure before the officers arrived." V. A. Leonard, *Police Communications Systems,* p 104 (1938).

The behavior this statute sought to outlaw was the breach of confidential two-way police radio communications occurring after a crime against persons or property had been detected. The statute was not meant to protect police attempts to detect crimes by means of a radio technology which had yet to be developed.[9]

---

[9] Two New York cases, *People v Moore,* 92 Misc 2d 807; 401 NYS2d 440 (1978), and *People v Faude,* 88 Misc 2d 434; 388 NYS2d 562 (1976), construed § 397 of that state's Vehicle and Traffic Law, the wording of which is virtually identical to the Michigan statute, and reached the conclusion that the term "radio receiving set" does not refer to radar detectors.

The dissenting opinion suggests that the basis for these decisions was that § 397 of the New York Vehicle and Traffic Law was found to be *in pari materia* with § 140.40 of the New York Penal Law, which prohibited the possession of a radio device by a person intending to use it in the commission of a felony, and that this statute defined a radio device as "any device capable of receiving a wireless *voice transmission* on any frequency allocated for police use." (Emphasis added.)

Though the wording of § 140.40 of the New York Penal Law proved dispositive in *People v Moore,* the court in *People v Faude* was not content to rest its decision on the wording alone. After noting that

Although the preceding history shows that this statute was designed to address a problem of law enforcement superficially similar to the one involved in the instant case, the methods of crime detection and the technology of radio were distinct when the Legislature proscribed the use of "radio

§ 140.40 of the New York Penal Law defined "radio device" restrictively, it proceeded to find further support for its conclusion in memoranda issued by the organization which spurred passage of both § 397 of the New York Vehicle and Traffic Law and § 140.40 of the New York Penal Law.

"In further support that the Legislature intended section 397 to prohibit only a device capable of receiving voice transmissions is a memorandum of State Association of Chiefs of Police, Inc. That memorandum was written in 1966 when section 397 was amended to include 'motor vehicles' as opposed to just 'automobiles.' (NY Legis Ann, 1966, p 26.)

"In discussing the reasoning behind this section, the memorandum states, in part, that: 'It was recently brought to police attention that burglars were operating with the look-out car being tuned to police frequencies listening to each call in case the burglary had been discovered and police cars were sent to the scene * * *. This is a great aid to the thieves in the commission of their burglaries by transmitting information received on the police frequencies by walkie-talkie radios to the burglars in the building advising them of any police action in the area'. (See NY Legis Ann, 1966, p 26, *supra.*)

"In a memorandum of State Association of Chiefs of Police published in reference to the adoption of section 140.40 of the Penal Law, it is noted that the purpose of that section 'is to provide that person is guilty of unlawfully possessing radio device who * * * possesses device capable of receiving *signals* on frequencies allocated for police use or device capable of transmitting or receiving wireless voice transmission under circumstances evincing intent to use same in commission of certain crimes' (emphasis added). (See NY Legis Ann, 1970, p 46.)

"A second memorandum indicates that 'This bill would prohibit the operation or maintenance in public places of radio sets capable of receiving *signals* or frequencies allocated for police use without authorization from appropriate police officials.' (Emphasis added.) (See NY Legis Ann, 1970, p 54.)

"In both memoranda, it is significant that the term 'signals' is used synonymously with the term 'voice transmissions', and 'voice messages.' Both memoranda go on to describe the activity sought to be prevented by prohibiting the use of these devices as the same activity described in the memorandum dealing with section 397 of the Vehicle and Traffic Law." 88 Misc 2d 436-437.

Insofar as these materials demonstrate that the New York statute was aimed at the same evil as gave rise to the Michigan statute, the interception of voice communications over police frequencies, *People v Faude* offers support for the view set forth in this opinion.

receiving sets" capable of receiving police voice transmission. In the years that followed, radio technology became a method for detecting wrongdoing. This advance created opportunities and problems of a different character than those which motivated the passage of this statute. Just as the Legislature could not predict the emergence of radar, we cannot predict the legislative response to this development. To hold that this statute addressed a problem that history tells us could not have been addressed is to impute an intent to the Legislature it could not have had.

Technological innovation may not be an obstacle to the application of a statute where the new technology facilitates the achievement of ends which the Legislature clearly meant to encourage or discourage.[10] But this is not such a case. Here the new technology is itself responsible for generating issues of public policy which the Legislature could not have foreseen or dealt with.

In states where the Legislature has specifically addressed the problem by prohibiting the use of radar detection devices, the statutory language is clear and unambiguous.[11] Where, as here, the enactment of the statute preceded any possible legislative consideration of the public policy issues, the proper course of action is to await legislative

[10] See, generally, Christiansen, *Technological Change & Statutory Interpretation,* 1968 Wis L Rev 556.

[11] For example, the Code of Virginia § 46.1-198.1 prohibits the "use of devices on motor vehicles to detect [the] presence of radar upon highways." This statute does not use the broad term "radio receiving set" but specifically applies to motor vehicles equipped with mechanisms to alert the operator to the presence of microwaves emitted by police radar systems. Similarly, Oklahoma Statute, title 47, § 11-808 prohibits the use of radar interference devices by motorists; section A.1 states that "it shall be unlawful for any person to operate a motor vehicle upon any public road, street, highway or turnpike of this state when such vehicle is equipped with any device designed for the purpose of, or capable of: 1. jamming or distorting signals received by radar."

judgment, not to engage in an uncertain attempt to anticipate it.[12]

## II

The lodestar of statutory construction is legislative purpose or intent. The Court of Appeals declared that the apparent purpose of the statute was "to enhance the efficient and effective execution of police functions" and it was "designed to prevent the monitoring of police movement".[13] Persons who use radar detectors, designed to frustrate law enforcement, are thus within the policy of the statute which seeks to facilitate effective law enforcement.

The dissenting opinion in this Court does not, in construing the statute, make reference to legislative purpose or intent, apparently because in the view there expressed the "plain meaning" of the statute is that the term "radio receiving set" "encompasses the term radar detector". The dissenting opinion adverts to statutory purpose in rejecting equal protection and due process challenges; the opinion states that the statute is de-

---

[12] The dissenting opinion, viewed in its entirety, contradicts itself. The "plain meaning" rule of statutory construction is said to yield the conclusion that a radar detector is a "radio receiving set". Then the rule of *People v Dempster,* 396 Mich 700; 242 NW2d 381 (1976) is said to yield the conclusion that this construction should be given prospective effect. No attempt is made to reconcile these two conclusions although they proceed from contradictory premises. The plain-meaning rule presupposes that the words of a statute are free of ambiguity and that their meaning is readily discernible to anyone who reads them. The *Dempster* rule becomes operative when there is a "practical possibility of ambiguity" that the words of a statute would not put potential defendants on notice of those acts which the statute forbids.

If a statute is free from ambiguity because its meaning is "plain", then no "clarifying gloss" on its language would be necessary and the *Dempster* rule would be inapplicable. If a statute is ambiguous and in need of a "clarifying gloss", then its meaning would not be "plain". These two conditions are not capable of being satisfied simultaneously.

[13] *People v Gilbert, supra,* 88 Mich App 770-771.

signed "to prevent the police from being impeded in the carrying out of their duties",[14] and "to facilitate law enforcement activity by restricting the use of radio receiving sets in motor vehicles because individuals using such sets could detrimentally monitor police frequencies",[15] and "the ultimate vice sought to be proscribed is the monitoring of police activity by private motorists".[16]

In so stating legislative purpose neither the Court of Appeals nor the dissenting opinion acknowledges that while using a radar detector can be characterized as being of the same nature as monitoring a radio-transmitted audible message, it need not be so characterized and there are other ways of looking at the matter.

## A

The statute was enacted to prohibit vehicular monitoring of police communications reporting a crime and directing police forces in an effort to apprehend offenders.

Radar detectors do not monitor communications between police officers. They rather alert the user that his vehicle is about to pass through a field of electronic surveillance.

The policy considerations that support the proscription of vehicular monitoring of confidential police communications do not necessarily extend to monitoring of police electronic surveillance.

Police communications concern the apprehension of persons who have committed crimes against persons or property. The offenders may be

[14] *People v Gilbert, infra,* p 223.

[15] *Id.*

[16] *People v Gilbert, infra,* p 224.

and often are armed. Monitoring poses not only the danger that the offenders will escape but that, having been alerted, they will ambush the police. Alerting persons who have committed serious offenses may necessitate the diversion of additional forces to aid the officers who first arrive on the scene and to assist in the pursuit. At stake is the safety of the officers and the enforcement of laws designed to protect persons and property. Although "speed kills" and the enforcement of the traffic laws is of great importance, different values are at stake where the monitoring of electronic surveillance is involved.

B

Under the Court of Appeals construction it would be violative of the statute to install an electronic device designed to determine whether the police are engaged in electronic surveillance of activities other than speeding. It appears that the technology may have already advanced to the point where a radio beam can be directed to hear conversations within an automobile. Or the police might surreptitiously install a radio device on an automobile to monitor conversations within the automobile. The police might install an electronic device at a gate or field to identify automobiles entering the area.

Persons who wish, by installing electronic detection devices, to protect themselves against such police intrusion and surveillance may not be violating any law but merely fearful that their activities, political and not criminal, have come to the attention of the authorities.

Electronic surveillance by the police is serious business and an intrusion into the privacy of anyone who is subjected to it.

While the constitution may protect against use in a criminal prosecution of evidence obtained by warrantless electronic surveillance, it is a matter of public policy to be decided in the first instance by the Legislature whether the police are authorized to conduct such operations. The police derive their authority from the Legislature, not the constitution. The police are not empowered to do whatever is not proscribed in the constitution. The Legislature alone can empower the police to engage in electronic surveillance. The Legislature did not, in 1929, address this issue of public policy in enacting the statute prohibiting the equipping of a vehicle with a radio receiving set.

## III

The statutory prohibition against equipping a vehicle with a "radio receiving set" fits into the broad category of crimes known as "possession offenses". In some instances, the Legislature prohibits the possession of an article not because the article is itself dangerous but because its possession evidences an intent to commit a further criminal act or increases the probability that such an act will be committed.[17] By criminalizing an intermediate step toward the commission of a crime, the Legislature hopes to reduce the likelihood that an ultimate criminal end will be achieved. The activity proscribed by a possession offense derives its harmfulness by reference to the ultimate criminal act which generates legislative concern. The rationale for outlawing radar detectors is not that radar detectors are in and of themselves dangerous, but rather that their use may permit motor-

---

[17] For a discussion of the rationale for "possession offenses", see Fletcher, Rethinking Criminal Law, § 3.4 (1978).

ists to escape apprehension for driving in excess of lawful speeds.

Possession offenses are generally thought to merit lesser punishment than the crimes they foreshadow. This conclusion rests on a societal judgment that some crimes are more blameworthy than others and deserve correspondingly greater censure. Because the criminal status of possession offenses, like other inchoate crimes, is derivative and their commission is not an unambiguous signal that a further crime will be committed, the law generally punishes the possession of the means to commit a crime less severely than the crime itself. In no instance does it punish the possession offense more severely. To do otherwise would be to deny a fundamental postulate of the criminal law, *viz.,* that punishment should be proportionate to the gravity of the criminal offense. A construction of a criminal statute which would produce a contrary result is to be avoided.

The Michigan Vehicle Code designates all violations of its prescribed speed limits as civil infractions.[18] The penalty for committing a civil infraction under the code is a fine not to exceed $100; and the infraction is not "a lesser included offense of a criminal offense".[19] The statute proscribing the equipping of a vehicle with a "radio receiving set" provides that an offender may be punished by a fine up to $500 or by a jail sentence up to one year or both, and an offender commits a high misdemeanor.[20]

Under the Court of Appeals construction, posses-

[18] MCL 257.628; MSA 9.2328.
[19] MCL 257.907; MSA 9.2607.
[20] MCL 750.508; MSA 28.776.

sion of a radar detector would carry with it a
criminal stigma, although the act which a prohibi-
tion of radar detectors would seek to discourage is
a civil wrong. A person who violates the speeding
laws may be fined no more than $100. The Court
of Appeals construction of the statute would thus
subject the acquisition of a device that can aid in
the violation of the speeding laws to punishment
far more severe than the act of speeding itself,
and, although speeding is not a criminal offense,
would criminalize possession of a radar detector.

Where the targets are potential robbers or bur-
glars, the penalties provided by the statute make
sense. This cannot be said where the statute is
employed to punish motorists who may violate the
traffic laws. It is improbable that the Legislature
would adopt such a penalty scheme for a traffic
related offense. A legislative purpose to do so is
not unmistakable and should not be attributed to
the Legislature.[21]

## IV

When the construction of the statute set forth in
the dissenting opinion is evaluated, whether in
light of the history of the statute and radar detec-
tors or teleologically, it is difficult to understand

[21] In states which bar police radar detectors the penalties for
possessing such devices are not more severe than those for violating
the speeding laws.

In Virginia, the violation of Va Code § 46.1-198.1, which prohibits
the use of radar detection devices, is a traffic infraction punishable by
a fine of not less than $25 nor more than $100. Violation of maximum
speed restrictions in Virginia constitutes a traffic infraction punish-
able by a fine of not more than $100. Va Code § 46.1-16.01.

In Oklahoma, the violation of Okla Stat, tit 47, § 11-808.D., which
prohibits the use of radar interference devices, is punishable by a fine
of not more than $200. A speeding violation is a misdemeanor
punishable by a fine of not less than $10 and not more than $200, or
not less than 5 days nor more than 30 days in jail, or by both fine and
imprisonment. Okla Stat, tit 47, § 11-807(c).

how it can be characterized as "narrow".[22] There are, minimally, significant doubts concerning the intended reach of the statute. Because courts are wary of creating crimes, penal statutes are to be strictly construed[23] and any ambiguity is to be resolved in favor of lenity:

" 'When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. And this not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or antisocial conduct. It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment.' " *Bell v United States,* 349 US 81, 83; 75 S Ct 620; 99 L Ed 905 (1955), quoted approvingly in *People v Bergevin,* 406 Mich 307, 312; 279 NW2d 528 (1979).

The scope of this statute is at least uncertain; it should be applied only to those acts which the Legislature clearly meant to proscribe. Far from resolving doubts in favor of the accused, the dissenting opinion would stretch the wording of the statute to encompass acts the Legislature not only failed to consider, but was in no position to foresee.

Technological innovation often breeds problems with which the Legislature has yet to grapple. Barring the use of radio detectors in automobiles may embody a wise public policy, but it is one the Legislature has not as yet embraced.[24]

---

[22] *People v Gilbert, infra,* p 217.

[23] See *People v Hall,* 391 Mich 175, 189-190; 215 NW2d 166 (1974).

[24] See Hand, "How Far is a Judge Free in Rendering a Decision?" (1935), reprinted in L. Hand, The Spirit of Liberty 103, 108 (New York: Alfred A. Knopf, 3d ed, 1960):
"When a judge tries to find out what the government would have intended which it did not say, he puts into its mouth things which he

## V

Many will agree with the view expressed in the dissenting opinion and by the Court of Appeals that it should be an offense to equip a motor vehicle with a radar detector. Motorists have no legitimate need to alert themselves to such police surveillance, a relatively innocuous intrusion which serves the important purpose of reducing the carnage on the highways. Persons holding that view would support a statute limited to radar detectors. Presumably, however, the potential penalties would not be as severe as are provided in this statute which, again, are considerably in excess of the penalties for speeding.

A statute proscribing possession or use of radar detectors may be in the public interest. But the proposed construction does not so limit the scope of the statute and would bring within its web any radio detector installed for any purpose in an automobile and would put everyone at risk of an expanded application of the precedent which such a construction would establish.

The Legislature can readily address the radar detector problem. The use of radar detectors and the evil they constitute, if evil it be, is well-known.

The Court of Appeals opinion was given prospective effect only.[25] A court should not place a tenu-

thinks it ought to have said, and that is very close to substituting what he himself thinks right. Let him beware, however, or he will usurp the office of government, even though in a small way he must do so in order to execute its real commands at all."

[25] The Court of Appeals declared that its opinion "serves to put all persons on notice that equipping one's vehicle with a radar detector is prohibited under Michigan law. As of the date of release of this opinion those persons equipping their vehicle with a radar detector may be prosecuted under MCL 750.508; MSA 28.776." *People v Gilbert, supra,* 88 Mich App 774.

ous construction on this statute to address a problem to which legislative attention is readily directed and which it can readily resolve if in its judgment it is an appropriate subject of legislation.

## VI

We have considered whether adoption of the view expressed in the opinion of the Court of Appeals and in the dissenting opinion would render this controversy moot because the construction of the statute there set forth would be given prospective effect only and the charges against Gilbert are dismissed.

In *Milford v People's Community Hospital Authority,* 380 Mich 49, 55-56; 155 NW2d 835 (1968), this Court declared that a question which is arguably moot may be decided where the nature of the case is such that this Court is "unlikely to again receive the question in the near future" and it affects a considerable number of persons who "cannot hope to have an answer to the questions raised unless we proceed to a decision".

The decision of the Court of Appeals in the instant case will govern or largely influence the disposition of other cases until superseded by a decision of this Court. Few persons charged with equipping a motor vehicle with a radio detector have the resources to litigate the question at all, let alone through the district court to the circuit court to the Court of Appeals, and then to this Court. A large number of persons are affected. Law enforcement agencies and the district and circuit courts need a final, definitive ruling. A construction of the statute by this Court will serve to further alert the Legislature to the subject

matter. We conclude, as did the Court in *Milford v People's Community Hospital Authority,* that "the case is of sufficient importance to warrant our decision" although it may indeed be arguably moot as to the defendant Gilbert.

We affirm the decision of the Court of Appeals insofar as it dismisses the charges against Gilbert.

COLEMAN, C.J., and KAVANAGH, FITZGERALD, RYAN, and BLAIR MOODY, JR., JJ., concurred with LEVIN, J.

WILLIAMS, J. *(dissenting).* The defendant in this case presents an issue of first impression for this state. We are asked to determine whether the defendant can be prosecuted under MCL 750.508; MSA 28.776 for equipping his motor vehicle with a radar detector or "Fuzzbuster". A pertinent part of the statute provides:

"Any person who shall equip a vehicle with a radio receiving set that will receive signals sent on frequencies assigned by the federal communications commission of the United States of America for police purposes, or use the same in this state * * * without first securing a permit * * * shall be guilty of a misdemeanor".

Under the challenged statute, we would hold that a radar detector falls within the definition of a radio receiving set. Secondly, the frequencies upon which the radar detector operates have been assigned for police purposes. Thus, the detection of such radio waves on assigned frequencies brings the device within the prohibition of the statute.

We also would hold that such enforcement is not pre-empted by the federal Communications Act of

1934. Furthermore, we would hold that the enforcement of the statute is a valid exercise of this state's police power, and that there is no equal protection violation. Finally, despite the logical clarity of the statute, we would affirm the dismissal of charges against the defendant, because a reasonable layperson might not heretofore have understood that radar was within the proscription of the act. However, we also agree with the Court of Appeals that because of our "judicial gloss" persons in the future could be prosecuted under the statute. We would affirm.

## I. FACTS

On December 3, 1976, defendant motorist was stopped by a Troy police officer. The officer observed that defendant's car was equipped with a radar detector. He charged the defendant with equipping or using a motor vehicle with a radio receiving set capable of receiving police signals in violation of MCL 750.508; MSA 28.776.

The charges were dismissed by the Troy Municipal Court, which found that, although a radar detector is a radio receiving set, it is not within the proscription of the statute. The Oakland Circuit Court, however, reversed the lower court and remanded the case for trial. The Court of Appeals dismissed the charges against the defendant, but held that persons in the future could be prosecuted under the statute. 88 Mich App 764; 279 NW2d 546 (1979); 93 Mich App 321; 287 NW2d 220 (1979) *(On Rehearing)*.

We granted leave on June 20, 1980. 408 Mich 960 (1980).

## II. STATUTORY INTERPRETATION

### A. *Radio Receiving Set*

The first issue which must be resolved is whether a radar detector is a "radio receiving set" under MCL 750.508; MSA 28.776.[1] The defendant asserts that the phrase "radio receiving set" should be interpreted in such a way that radar detectors are excluded because such devices do not receive voice communications.[2] We would hold that a radar detector is included in the statute.

The relevant statutory language provides:

"Any person who shall equip a vehicle with a radio receiving set that will *receive signals*". (Emphasis added.)

The trial record indicates that a radar detector, even though it receives signals at a different fre-

---

[1] MCL 750.508; MSA 28.776 provides:

*"Any person who shall equip a vehicle with a radio receiving set that will receive signals sent on frequencies assigned by the federal communications commission of the United States of America for police purposes, or use the same in this state* unless such vehicle is used or owned by a peace officer or a bona fide amateur radio operator holding a conditional, general, advanced or extra class amateur license issued by the federal communications commission, *without first securing a permit* so to do from the commissioner of the Michigan state police upon such application as he may prescribe, *shall be guilty of a misdemeanor,* punishable by imprisonment in the county jail not more than 1 year or by a fine of not more than $500.00 or by both such fine and imprisonment in the discretion of the court." (Emphasis added.)

[2] The defendant relies heavily on two New York cases. *People v Moore,* 92 Misc 2d 807; 401 NYS2d 440 (1978); *People v Faude,* 88 Misc 2d 434; 388 NYS2d 562 (1976). In both cases, the court did not find radar detectors to be radio devices because they are not capable of receiving voice transmissions. These cases are easily distinguished from the instant case because § 140.40 of the New York Penal Law, which governs the use of certain radio devices, specifically defines radio device as "any device capable of receiving a wireless voice transmission on any frequency allocated for police use".

quency, receives the same radio waves or signals as does a conventional radio. The insignificant difference between the two is that the radar detector does not transform the *received signals* into the same type of output.

The commonality of radar and radio receiving sets is apparent from the fact that the term radar is a convenient acronym for "RAdio Detection And Ranging". *State v Tomanelli,* 153 Conn 365, 369; 216 A2d 625 (1966). Furthermore, *Webster's Third New International Dictionary, Unabridged (1966) Edition,* p 1871, has defined "radar" as "a radio device or system for locating an object by means of emitting radio signals". Consequently, when comparing the terms "radio" and "radar", it is immediately apparent that radio is a broad designation given to devices that receive wireless signals or radio waves and that radar is simply one type of radio device that also receives such signals. Therefore, construing MCL 750.508; MSA 28.776 narrowly, as we must, we conclude that the term radio receiving set encompasses the term radar detector within the plain meaning of the statute. In *People v Hall,* 391 Mich 175, 189-190; 215 NW2d 166 (1974), we stated that "the fact that these types of statutes [penal] are narrowly construed does not require rejection of that sense of the words which best harmonizes with the overall context of the statutes".

## B. Assigned for Police Purposes

The issue is whether, on the record, the radar frequency in question was assigned for police use. The operative language of the statute reads:

"Any person who shall equip a vehicle with a radio receiving set * * * on frequencies *assigned* by the fed-

eral communications commission * * * *for police pur-
poses".* (Emphasis added.)

The record indicates that the frequency of 10,-
525 megahertz has been assigned for police pur-
poses. The record specifically shows that the Michi-
gan State Police department was granted a license
to operate its radar device on the frequency of
10,525 MHz.

Defendant contends that the assignment must
be *exclusively* for police use. Plaintiff's witness
testified that, except for low-power burglar alarm
systems, this frequency is exclusively assigned for
police use. There was no contrary testimony. How-
ever, there is no statutory requirement of exclusiv-
ity in the frequencies assigned for police purposes.
The plain and unambiguous language of the stat-
ute only requires that the relevant frequencies be
assigned by the Federal Communications Commis-
sion (FCC) for police purposes. Accordingly, we
would hold that the frequency utilized by police
radar has been assigned by the FCC "for police
purposes".

### III. PRE-EMPTION BY FEDERAL
### COMMUNICATIONS ACT

The defendant also asserts that the Communica-
tions Act of 1934,[3] which provides for a compre-
hensive regulatory scheme, reflects a Congressio-
nal intent to pre-empt the field of radio reception.
Therefore, he argues that MCL 750.508; MSA
28.776 must yield to the Supremacy Clause of the
United States Constitution. US Const, art VI, cl 2.
In advocating this claim, the defendant looks to
the legislative history of the Communications Act,
the pervasiveness of its regulatory scheme and to

[3] 47 USC 151 *et seq.*

§ 605[4] as being the exclusive limitation on radio reception. The plaintiff, however, asserts that the Michigan statute and the policy reasons for its adoption do not unsettle the federal scheme and that it represents a valid exercise of this state's police power.

The exercise of state powers must yield to an act of Congress with which it conflicts. But the United States Supreme Court, in assessing the proper interface between state and federal schemes, has indicated that the challenged state action will be pre-empted only when it becomes an obstacle to the accomplishment of a national objective. In *Pennsylvania v Nelson,* 350 US 497, 502-506; 76 S Ct 477; 100 L Ed 640 (1956), that Court fashioned a three-pronged analysis to be used in establishing the pre-emption parameters: (1) the pervasiveness of the federal scheme; (2) federal occupation of a field dictated by the need for national uniformity; and (3) danger of conflict between state laws and the administration of the federal program.

However, the Court has applied a narrow definition to the term "conflict". In *Rice v Santa Fe Elevator Corp,* 331 US 218, 230; 67 S Ct 1146; 91 L Ed 1447 (1947), the Court stated that when a state exercise of its police power is challenged under the Supremacy Clause, "we start with the assumption that the historic powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress".

We agree with the Court of Appeals that the federal scheme of allocating frequencies for radio transmission may be pervasive as the legislative history indicates. The need for uniformity, how-

---

[4] 47 USC 605.

ever, is not so strong that the federal interest should dominate over an important state interest. The United States Supreme Court mandated no less a principle in *Head v New Mexico Board of Examiners in Optometry,* 374 US 424, 431; 83 S Ct 1759; 10 L Ed 2d 983 (1963). In that case, the Court held that the federal regulatory scheme created by the Communications Act was not so pervasive or the need for uniformity so strong that the states were foreclosed from regulating the content of advertising messages over the airwaves. The exercise of a state's police power in regulating highway safety is an equally strong interest. Cases where state regulation of radar was held not pre-empted by the Communications Act include: *Smith v Dist of Columbia,* 436 A2d 53 (1981); *Bryant Radio Supply, Inc v Slane,* 507 F Supp 1325 (WD Va, 1981), *aff'd* 669 F2d 921 (CA 4, 1982) (state regulation of radar not pre-empted); *State v Anonymous (1980-8),* 36 Conn Supp 551; 421 A2d 867 (1980); *Crenshaw v Commonwealth,* 219 Va 38; 245 SE2d 243 (1978).

The Michigan statute was adopted to facilitate effective law enforcement activity and to protect police frequencies from being used by people who wish to circumvent the laws. "Radar detectors have no utility other than aiding an illicit effort to drive in an irresponsible manner, evading society's punishment for such conduct." *Smith, supra,* 59. The connection between the prohibition of radar detectors and law enforcement and highway safety is quite obvious, and the recognition of an important state interest also supports the rationality of the federal scheme.

Finally, there is no direct conflict between MCL 750.508; MSA 28.776 and the Communications Act.

Under 47 CFR 90.103(a), the FCC has established the requirements for eligibility for authorization to employ radiolocation devices. This fact reinforces the notion that the proscription of radar detectors complements rather than conflicts with the federal scheme. The defendant gets no relief by arguing that § 605 of the act is an exclusive enforcement device which may not be extended by state legislation. This provision exists to deal with the rights of senders and recipients of communications. Section 605 was not legislatively intended to regulate the detection of radio transmissions. Accord, *Bryant Radio Supply, supra,* 1328.

Therefore, defendant has failed to persuade us that Congress has clearly manifested an intent to pre-empt state activity in the regulation of radar detectors. By following the mandate of the United States Supreme Court that the presumption is against pre-emption when there is a strong state interest, we would hold that the prohibition against equipping or using radar detectors under MCL 750.508; MSA 28.776 is not pre-empted by the Communications Act of 1934.

## IV. EQUAL PROTECTION

Defendant argues that MCL 750.508; MSA 28.776 denies him equal protection under the Michigan and federal constitutions. Const 1963, art 1, § 2; US Const, Am XIV.

In *Alexander v Detroit,* 392 Mich 30, 35-36; 219 NW2d 41 (1974), this Court, after recognizing the various tests employed by the United States Supreme Court in equal protection analysis, found two tests to guide the Court in its scrutiny of challenged legislation:

"(1) Are the enactment's classifications based on natural distinguishing characteristics and do they bear a reasonable relationship to the object of the legislation?"

"(2) Are all persons of the same class included and affected alike or are immunities or privileges extended to an arbitrary or unreasonable class while denied to others of like kind?" (Citations omitted.)

Moreover, in *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975), we discussed the two-tiered approach to equal protection and its shifting burden of proof. If an interest is fundamental or a classification suspect, a reviewing court will apply a strict scrutiny test, requiring the state to justify by showing a compelling state interest.

Other legislative classifications are reviewed under the traditional equal protection test. The burden is then on the party challenging the legislation to show that it is without reasonable justification:

"It has been said that '[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it'. A classification will stand unless it is shown to be 'essentially arbitrary'. Few statutes have been found so wanting in 'rationality' as to fail to satisfy the 'essentially arbitrary' test." *Manistee Bank, supra,* 668 (footnotes omitted).

Defendant cites *Reed v Reed,* 404 US 71; 92 S Ct 251; 30 L Ed 2d 225 (1971), which involved an Idaho statute giving preference to men over women in the administration of decedents' estates, for the proper test.[5] In the case at bar, it becomes

---

[5] The test requested by the defendant is the substantial-relation-to-the-object test which is a middle-tier review. In *Manistee Bank & Trust Co v McGowan, supra,* 394 Mich 668-671, this Court indicated that the substantial relation test should be applied where a challenged statute carves out a discrete exception to the general and the

immediately apparent that the challenged legislation does not involve such a class or even a fundamental interest. Therefore, the burden is on the defendant to show that the classification is arbitrary and does not bear a rational relationship to the object of the legislation.

The defendant seeks to sustain his burden by saying that the Legislature reasonably made the exemption of peace officers and FCC-licensed amateur radio operators in the context of voice radio, because the purpose of the statute was to avoid tipping off burglars to the approach of police. He insists that this rationale does not apply in the case of radar and the Court of Appeals interpretation as to the purpose of the statute, *viz.,* the promotion of highway safety. We are not impressed by defendant's argument, because the essential statutory purpose under his and the Court of Appeals interpretation is that the prohibition of use of a radio device on police frequencies is to prevent the police from being impeded in the carrying out of their duties. So if the classification is reasonable under the defendant's interpretation, it is reasonable under the Court of Appeals interpretation. In short, the defendant has failed in his burden to show the classification is arbitrary.

We find that the statute was enacted to facilitate law enforcement activity by restricting the use of radio receiving sets in motor vehicles because individuals using such sets could detrimentally monitor police frequencies. Furthermore, the exemptions are rationally related to the statutory objective because the Legislature found that such

exception is no longer experimental. It has no application in the instant case. For an excellent review of middle-tier scrutiny, see Roberts, *Gender-Based Draft Registration, Congressional Policy and Equal Protection: A Proposal for Deferential Middle-Tier Review,* 27 Wayne L Rev 35 (1980).

individuals are more accountable when using their sets.

## V. Due Process

For reasons similar to those discussed with respect to equal protection, we would hold that there is no denial of due process under the Michigan Constitution. Const 1963, art 1, § 17. As we stated in *Shavers v Attorney General,* 402 Mich 554, 612-614; 267 NW2d 72 (1978):

"The test to determine whether legislation enacted pursuant to the police power comports with due process is whether the legislation bears a reasonable relation to a permissible legislative objective. * * *

"The test to determine whether a statute enacted pursuant to the police power comports with equal protection is, essentially the same. * * *

"In the application of these tests, it is axiomatic that the challenged legislative judgment is accorded a presumption of constitutionality. * * * What this 'presumption of constitutionality' means, in terms of challenged police power legislation, is that in the face of a due process or equal protection challenge, 'where the legislative judgment is drawn in question', a court's inquiry 'must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it'." (Footnotes and citations omitted.)

As we have already indicated, we would hold that the statutory objective of proscribing the equipping or use of vehicles with radar detectors is reasonably related to promotion of public health, welfare, and safety, a legitimate use of the state police power.

It is unquestionably true that the ultimate vice sought to be proscribed is the monitoring of police activity by private motorists. The prevention of

such monitoring is the apparent statutory objective. It is difficult to conclude, however, that proscribing the equipping of a vehicle with a radar detector tuned to a police frequency is not a means of rationally achieving that lawful objective.

Our question, therefore, is whether there is such separation between the means chosen by the Legislature and its legitimate objective as to render the statute invalid because of a lack of due process. Although there may be a logical and semantic difference between equipping a vehicle to monitor and the actual monitoring of police frequencies, it is difficult for us to conclude that there is no reasonable nexus between the means chosen and the public safety objective to be achieved, particularly since the "challenged legislative judgment is accorded a presumption of constitutionality". *Shavers, supra,* 613.

The Legislature has, without successful constitutional objections, enacted other legislation with a similar nexus. For example, the mere carrying of a concealed dangerous weapon is unlawful because the Legislature, in its wisdom, believed that such a provision would be in the public interest.[6]

In short, the Michigan Legislature has exercised, without disapproval, broad discretion in creating reasonable means which are needed in protecting the public to achieve legitimate police power objectives.[7]

---

[6] MCL 750.227; MSA 28.424 states that:

"A person who shall carry a dagger, dirk, stiletto, or other dangerous weapon * * * concealed on or about his person * * * shall be guilty of a felony".

[7] Under the felony-firearm statute, MCL 750.227b; MSA 28.424(2), for example, the mere possession of a firearm during the course of a felony is punishable. The purpose of the statute is to deter the use of handguns during the course of a felony. The bare fact that a felon has a firearm at his disposal should he need it creates a sufficient risk to others that it is within the state's power to punish its possession. See *People v Elowe,* 85 Mich App 744; 272 NW2d 596 (1978).

As we have stated in section IV, we find that the statute was enacted to facilitate law enforcement activity by protecting police frequencies. Furthermore, the proscriptions are rationally related to the statutory objective to protect public safety. In short, we find no lack of due process under the Michigan Constitution.

## VI. The *Dempster* Rule

Nevertheless, we agree with the defendant that there was the practical possibility of such ambiguity that a person of ordinary intelligence might not have been put on notice that the use of radar detectors is forbidden under the statute. This Court, however, in *People v Dempster,* 396 Mich 700, 715-716; 242 NW2d 381 (1976), quoting *Bouie v City of Columbia,* 378 US 347, 353, 355; 84 S Ct 1697; 12 L Ed 2d 894 (1964), noted that a "clarifying gloss" could eliminate such a problem in the future:

"It is. true that interpretations of statutory provisions by a court may add a clarifying gloss to otherwise unclear words, and thereby provide constructive notice to *future* defendants, but

" 'an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law * * *' and '* * * the effect is to deprive [the defendant] of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime.' "

Therefore, we agree with the Court of Appeals[8] both that the charges lodged against this particular defendant should be dismissed and that all persons shall be on notice that equipping one's

[8] 88 Mich App 764, 774; 279 NW2d 546 (1979).

vehicle with a radar detector is unlawful in Michigan.

## VII. CONCLUSION

It was proper for the Court of Appeals to have dismissed the charges against the defendant. We would hold, however, that persons in the future can be prosecuted under MCL 750.508; MSA 28.776 because a radar detector is a radio receiving set which receives signals on frequencies that have been assigned for police purposes.

In addition, we find no conflict between the statute and the Communications Act of 1934. By enforcing the statute, the state is exercising its valid police powers which complement the regulatory scheme of the act. Furthermore, the challenged exemptions of the statute do not run afoul of the Equal Protection Clauses of the Michigan and federal constitutions. Accordingly, we would affirm the decision of the Court of Appeals.